**NORTHERN PLAINS RESOURCE COUNCIL, Plaintiff– Appellant,**

v.

**FIDELITY EXPLORATION AND DEVELOPMENT COMPANY, Defendant–Appellee.**

No. 02–35836.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 4, 2003.

Filed April 10, 2003.

Jack R. Tuholske, Missoula, MT, for Appellant.

Ronald Waterman and Jon Metropoulos, Gough, Shanahan, Johnson & Waterman, Helena, MT, for the appellee.

John B. Arum and Steven H. Chestnut, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, WA, for amicus curiae Northern Cheyenne Tribe.

Elizabeth A. Brennan, Rossbach Brennan, Missoula, MT, for amicus curiae Tongue & Yellowstone Irrigation District.

Brenda Lindlief Hall, Reynolds, Motl & Sherwood, for amicus curiae Tongue River Water Users' Association.

Michael S. Kakuk and Palmer Hoovestal, Hoovestal, Kakuk & Fanning, Helena, MT, for amicus curiae Western Environmental Trade Association.

Before REINHARDT, W. FLETCHER, and GOULD, Circuit Judges.

## OPINION

GOULD, Circuit Judge.

Defendant–Appellee Fidelity Exploration & Development Company ("Fidelity") extracts methane gas for commercial sale from coal seams located deep underground in the Powder River Basin, Montana. In the process of extracting coal bed methane (CBM), Fidelity pumps groundwater to the surface and discharges this water into the Tongue River. The water discharged is "salty," contains several chemical constituents identified as pollutants by Environmental Protection Agency (EPA) regulations, has characteristics that may degrade soil, and is unfit for irrigation. The Montana Department of Environmental Quality (MDEQ) advised Fidelity that no permit was required to discharge the coal bed methane groundwater because Montana state law exempts unaltered groundwater from state water quality requirements. Plaintiff–Appellant Northern Plains Resource Council (NPRC) filed a citizen suit under the federal Clean Water Act (CWA) in the District Court for the District of Montana, alleging that Fidelity unlawfully discharged pollutants into navigable waters of the United States. NPRC appeals the district court's grant of summary judgment to Fidelity.

On appeal, we decide (1) whether the CBM discharge water is a "pollutant" within the meaning of the CWA, and (2) whether Montana state law can exempt Fidelity from obtaining National Pollution Discharge Elimination System (NPDES) permits under the CWA. We hold that the unaltered groundwater produced in association with methane gas extraction, and discharged into the river, is a pollutant within the meaning of the CWA. We also hold that states cannot create exemptions

to the CWA, whether or not the EPA has delegated permitting authority to the state.

## I

In 1997, Fidelity began exploring and developing natural gas from coal seams in the Powder River Basin, Montana. The coal reserves in Powder River Basin are several hundred feet below the ground and contain reservoirs of methane gas. The methane is trapped by groundwater that fills the interstitial areas of the coal reserves. To extract the methane, Fidelity drills a conventional well into the coal seam and pumps the trapped water to the surface to reduce water pressure. This pumping releases the trapped methane, which is captured at the surface and piped to market. Fidelity does not add chemicals to the pumped groundwater (CBM water). Fidelity discharges the unaltered CBM water into the Tongue River. Because CBM water comes from deep underground aquifers, it would not reach the Tongue River were it not for Fidelity's extraction process.

Though Fidelity does not add any chemicals to the CBM water before discharge, the water in its natural state contains suspended solids, calcium, magnesium, sodium, potassium, bicarbonate, carbonate, sulfate, chloride, and fluoride. The CBM water also contains measurable quantities of the following metals: aluminum, arsenic, barium, beryllium, boron, copper, lead, iron, manganese, strontium, and radium.

The CBM water is "salty," a characteristic measured by total dissolved solids or specific conductance. The mean total dissolved solids for the Tongue River is 475 mg/l as compared to 1,400 mg/l for the CBM water. Related to the "saltiness" of the CBM water is the water's high Sodium Absorption Ratio (SAR). SAR measures the ratio of sodium to calcium and magnesium in the water. The SAR of the CBM water discharged by Fidelity is on average 40 to 60 times greater than the background SAR of the Tongue River. For all these reasons, the CBM water is distinctly different from the Tongue River water to which it is added.

Farmers who use water from the Tongue River for irrigation are concerned with the "saltiness" and high SAR of CBM water because of the potential hazards these characteristics pose to soil structure. High SAR water, such as CBM water, causes soil particles to unbind and disperse, destroying soil structure and reducing or eliminating the ability of the soil to drain water. The Montana Department of Environmental Quality (MDEQ), in a Final Environmental Impact Statement analyzing coal bed methane extraction, warns that "clayey" soil, like that in the Tongue River Valley, is vulnerable to damage from high SAR water. Montana Statewide Final Oil and Gas Environmental Impact Statement and Proposed Amendment of the Powder River and Billings Resource Management Plans (hereinafter "Montana FEIS"), Soils Appendix SOI–1, *available at* www.deq.state.mt.us/CoalBedMethane/finaleis.asp. Fidelity's soil expert concluded that "the SAR of CBM water creates a permeability hazard and precludes its use for irrigation without mixing, treatment or addition of soil amendments." The MDEQ cautioned that unregulated discharge of CBM water would cause "[s]urface water quality in some watersheds [to] be slightly to severely degraded, resulting in restricted downstream use of some waters." *Id.* 4–72. Some of the CBM water, however, is used by Fidelity's grazing lessee, CX Ranch, in livestock watering ponds and stock tanks.

In August 1998, Fidelity contacted the MDEQ about the possibility of discharging its CBM water into the Tongue River and Squirrel Creek. By letter, the MDEQ told

Fidelity that it did not need a permit from the MDEQ to discharge into the Tongue River because the discharge was exempt under Montana Code section 75–5–401(1)(b), which provides:

> Discharge to surface water of groundwater that is not altered from its ambient quality does not constitute a discharge requiring a permit under this part if: (i) the discharge does not contain industrial waste, sewage, or other wastes; (ii) the water discharged does not cause the receiving waters to exceed applicable standards for any parameters; and (iii) to the extent that the receiving waters in their ambient state exceed standards for any parameters, the discharge does not increase the concentration of the parameters.

The MDEQ, however, warned Fidelity in the same letter that "the EPA, which provides state program oversight under the federal Clean Water Act, does not agree with the [Montana] Water Quality Act permit exclusion under 75–5–401(1)(b). Therefore, they may ask at some point that you obtain an [Montana Pollution Discharge Elimination System (MPDES) ] permit from us, or an NPDES permit from them."[1] The EPA told MDEQ that section 75–5–401(1)(b) of the Montana Code conflicts with the CWA because it exempts some discharges otherwise subject to the CWA from NPDES permitting requirements. The EPA stressed that "the fact that a discharge does not increase the concentration of a particular parameter does not exempt it from permitting re-

quirements." The MDEQ responded, resisting revocation of the section 75–5–401(1)(b) exemption and arguing that "the exemption is consistent with federal requirements governing NPDES programs because discharges of unaltered, natural groundwater do not contain 'pollutants' as that term is defined under the Clean Water Act." In a final letter sent to the MDEQ by the EPA, the EPA reiterated its objection to section 75–5–401(1)(b) if applied to discharges that would otherwise require a permit under the CWA.

Even though MDEQ informed Fidelity in August 1998 that Montana state law exempted the discharge of unaltered groundwater, Fidelity filed MPDES permit applications in January 1999. At that time, Fidelity was discharging into both Squirrel Creek and the Tongue River without a permit.

NPRC sent a 60–day Notice of Intent to Sue letter to Fidelity, the MDEQ, and the EPA on April 18, 2000. NPRC alleged unpermitted discharges of pollutants into Squirrel Creek and the Tongue River. On June 23, 2000, NPRC filed a citizen suit under the CWA in federal district court alleging unpermitted discharges into Squirrel Creek. An amended complaint was filed on June 26, 2000, to add allegations of unlawful discharges into the Tongue River from outfalls not covered by an MPDES permit.[2]

The parties filed cross-motions for summary judgment in district court. The parties stipulated that of the five elements

---

**1.** Congress has authorized both the EPA and states to implement CWA permit programs. *See* 33 U.S.C. § 1342(a)-(b). The EPA issues NPDES permits, whereas Montana issues MPDES permits.

**2.** On June 16, 2000, the MDEQ issued Fidelity an MPDES permit authorizing Fidelity to discharge into the Tongue from seven specified outfalls. The MDEQ did not issue a permit to

discharge into Squirrel Creek. Even though the MPDES permit allowed discharge into the Tongue River from seven outfalls, Fidelity discharged from twelve outfalls and continued to do so until the MDEQ amended the permit on July 3, 2000, to allow discharge from ten outfalls. Fidelity did not receive an amended permit allowing discharge from ten outfalls until after the amended complaint was filed.

necessary to prove a violation of the CWA ((1) discharge, (2) pollutant, (3) from a point source, (4) to a navigable water, (5) without a permit), the only element at issue is whether the CBM water constitutes a pollutant; the other four elements are satisfied. The district court held that the CBM water was not a pollutant and granted summary judgment to Fidelity. NPRC appeals.[3]

## II

The CWA prohibits the discharge of any pollutant from a point source into navigable waters of the United States without an NPDES permit. 33 U.S.C. §§ 1311(a), 1342. *See also Ass'n to Protect Hammersley, Eld, and Totten Inlets (APHETI) v. Taylor Res., Inc.*, 299 F.3d 1007, 1009 (9th Cir.2002). Fidelity and NPRC agree that Fidelity discharged CBM water from a point source into navigable water without an NPDES permit. Given this agreement, we need only decide whether the groundwater derived from CBM extraction is a "pollutant" within the meaning of the CWA.

The district court granted summary judgment to Fidelity based on two conclusions: (1) CBM produced water is not a pollutant within the meaning of the CWA, and (2) Montana state law exempted Fidelity from CWA permitting requirements. We have jurisdiction, 33 U.S.C. § 1365(a); 28 U.S.C. § 1331, we review the district court's grant of summary judgment de novo, *see Oliver v. Keller*, 289 F.3d 623, 626 (9th Cir.2002), and we reverse.

■ To determine whether CBM water is a "pollutant" regulated by the CWA, we begin with the plain language of the stat-

ute. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). The CWA defines "pollutant" broadly:

> The term "pollutant" means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and *industrial*, municipal, and agricultural *waste* discharged into water. This term does not mean . . . water, gas, or other material which is injected into a well to facilitate production of oil and gas, *or water derived in association with oil or gas production and disposed of in a well*, if the well used either to facilitate production or for disposal purposes is approved by authority of the State in which the well is located, and if such State determines that such injection or disposal will not result in the degradation of ground or surface water resources.

33 U.S.C. § 1362(6) (emphasis added). Because this definition does not literally list "unaltered groundwater" as a pollutant, Fidelity argues, and the district court held, that CBM water is not a "pollutant." Fidelity's argument and the district court's holding are untenable. The plain language of the CWA requires the conclusion that CBM water is a pollutant subject to regulation under the CWA.

■ The reasons for our conclusion are apparent from the statute's terms. First, CBM water is a "pollutant" because it is "industrial waste." Contrary to Fidelity's suggestion that "industrial waste" re-

---

**3.** Three amici briefs were filed in this case: (1) The Western Environmental Trade Association (WETA) filed a brief in support of Fidelity. WETA is an extraction industry advocacy group; (2) Tongue & Yellowstone Irrigation District and Tongue River Water Users' Asso-

ciation (T & Y) filed a brief in support of NPRC. T & Y is a group of ranchers and farmers who depend on the Tongue River for irrigation; and (3) Northern Cheyenne Tribe (Tribe). The Tongue River forms the eastern boundary of the Tribe's Reservation.

fers to "sludge oozing from manufacturing or processing plants, barrels filled with toxic slime, and raw sewage floating in a river," industrial waste is not limited to only the most heinous and toxic forms of industrial byproducts. *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.,* 73 F.3d 546, 568 (5th Cir.1996) (concluding "produced water" is encompassed in "industrial waste"); *see also Hudson River Fishermen's Ass'n v. City of New York,* 751 F.Supp. 1088, 1101 (S.D.N.Y.1990) (holding that chlorine residues are pollutants), *aff'd,* 940 F.2d 649 (2d Cir.1991); *Umatilla Waterquality Protective Ass'n, Inc. v. Smith Frozen Foods, Inc.,* 962 F.Supp. 1312, 1322 (D.Or.1997) (holding that brine residues are industrial waste and therefore pollutants). "Industrial" means "of, pertaining to, or derived from industry." American Heritage Dictionary 672 (1979). "Industry," in turn, is defined as "the commercial production and sale of goods and services." *Id.* "Waste" is defined as "any useless or worthless byproduct of a process or the like; refuse or excess material." *Id.* at 1447. Combining these ordinary meanings, "industrial waste" is any useless byproduct derived from the commercial production and sale of goods and services. Because Fidelity is engaged in production of methane gas for commercial sale and because CBM water is an unwanted byproduct of the extraction process, CBM water falls squarely within the ordinary meaning of "industrial waste." Even Fidelity referred to CBM water as "wastewater" in its application to the EPA for an NPDES permit.

◼ Second, CBM water is also a "pollutant" by virtue of being "produced water" derived from gas extraction. *See Cedar Point Oil Co.,* 73 F.3d at 568 (addressing whether discharge of water "produced" during the extraction of oil and gas without an NPDES permit violated the CWA and concluding that produced water is an "industrial waste" regulated by the CWA). The EPA defines "produced water" as "water (brine) brought up from the hydrocarbon-bearing strata during the extraction of oil and gas, and *can* include formation water, injection water, and any chemical added downhole or during the oil/water separation process." 40 C.F.R. §§ 435.41(bb), 435.11(bb) (emphasis added). Fidelity argues that the CBM water is not "produced water" because Fidelity adds no chemicals to the water. Whether CBM water is "produced water," however, does not turn on the addition of chemicals or any other alteration. The EPA regulations provide that "produced water" *can* include added chemicals, but the definition does not require it. *See id.* CBM water is "produced water" because it is brought up from the coal seams underlying Powder Basin to extract methane gas.

The CWA contemplates that produced water, as defined by EPA regulations, is a pollutant within the meaning of the Act. The CWA only exempts water derived from gas extraction from regulation when the water is disposed of in a well and will not result in the degradation of other water bodies. 33 U.S.C. § 1362(6)(B). *Cf. Cedar Point Oil,* 73 F.3d at 568 ("produced water" is a pollutant if its discharge does not meet exemption criteria). Fidelity disposes of the CBM water by direct discharge to the Tongue, not by reinjection into a state-approved well. Because Fidelity discharges "produced water" and does not meet § 1362(6) exemption criteria, the CBM water discharged by Fidelity is a pollutant within the plain meaning of the CWA and is subject to NPDES permitting requirements.

Third, concluding that CBM water is a pollutant is consistent with the CWA's definition of "pollution." *Cf. APHETI,* 299 F.3d at 1017 (considering the definition of

"pollution" to determine whether biological materials emitted by mussels are "pollutants"). "Pollution" is the "man-made or maninduced alteration of the chemical, physical, biological, and radiological integrity of water." 33 U.S.C. § 1362(19). By discharging CBM water into the Tongue River, Fidelity alters the water quality of the Tongue River. In particular, the MDEQ, in the Montana Environmental Impact Statement analyzing the impact of CBM production on Montana waterways, cautions that the resulting alteration may degrade, and limit uses of, the receiving water: "Surface water quality in some watersheds would be slightly to severely degraded, resulting in restricted downstream use of some waters." Montana FEIS at 4–72. And, unregulated discharge of CBM water to the Tongue River threatens to make the water unfit for irrigation. *Id.* at 4–138.

■ Because Fidelity's discharges of CBM water alter the water quality of the Tongue River, those discharges cause "pollution" as defined by the CWA. *See PUD No. 1 of Jefferson County. v. Wash. Dep't of Ecology*, 511 U.S. 700, 705, 114 S.Ct. 1900, 128 L.Ed.2d 716 (1994) (citing 33 U.S.C. § 1313(d)(4)(B) and recognizing CWA's "antidegradation policy" requiring state water quality standards to prevent further degradation of the Nation's waters); 40 C.F.R. § 131.12 (antidegradation policy regulation). Were we to conclude otherwise, and hold that the massive pumping of salty, industrial waste water into protected waters does not involve discharge of a "pollutant," even though it would degrade the receiving waters to the detriment of farmers and ranchers, we would improperly "undermine the integrity of [the CWA's] prohibitions." *APHETI*, 299 F.3d at 1016.

■ The district court determined that the CWA's definition of "pollution" supports a conclusion that CBM water is *not* a pollutant because Fidelity does not alter the CBM water before discharging it. We disagree with the district court's interpretation of the definition. The requirement that the physical, biological, or chemical integrity of the water be a "maninduced" alteration refers to the effect of the discharge on the receiving water; it does not require that the discharged water be altered by man. *See Miccosukee Tribe v. S. Fla. Water Mgmt. Dist.*, 280 F.3d 1364, 1368 (11th Cir.2002) ("[I]n determining whether pollutants are added to the navigable waters for purposes of the CWA, the receiving body of water is the relevant body of navigable water."). A contrary reading of the definition is illogical because the goal of the CWA is to protect receiving waters, not to police the alteration of the discharged water. *See* 33 U.S.C. § 1251 (The objective of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters"). Here, the alteration of the chemical integrity of the Tongue River is "maninduced," as the CBM water would not flow into the Tongue River but for Fidelity's methane extraction processes, and that must be a focus of our concern under the CWA. Contrary to the district court's conclusion, the definition of "pollution" supports a finding that CBM water *is* a pollutant.

In arguing that CBM water is not a pollutant, Fidelity makes much of the fact that the CBM water is "unaltered," "naturally occurring," and that it is only water. Fidelity relies on *APHETI* to argue that only those substances "transformed by human activity" can be pollutants under the CWA. *See APHETI*, 299 F.3d at 1017. Fidelity misapplies *APHETI*.

In *APHETI*, we clarified the meaning of "biological materials," a term included in the CWA's definition of "pollutant." *Id.* at 1016; *see also* 33 U.S.C. § 1362(6). In considering whether excrement from mus-

sels suspended from rafts in Puget Sound was a pollutant under the CWA, we distinguished between biological materials that naturally occur in receiving waters, such as mussel feces, and biological materials that result from human activity, such as the "heads, tails, and internal residuals" of fish dumped back into the waters after processing. *APHETI*, 299 F.3d at 1017. Because one purpose of the CWA is to protect shellfish, we concluded that shellfish are not pollutants under the CWA unless human activity transforms them. *Id.* This conclusion was necessary to preserve the "integrity of the [CWA's] prohibitions." *Id.* at 1016.

*APHETI* cannot sensibly be read to require human transformation of all materials identified in the CWA's definition of "pollutant." For one thing, the CWA definition of "pollutant" includes such terms as "rock," "sand," and "heat." *See* 33 U.S.C. § 1362(6). It is the introduction of these contaminants, not their transformation by humans, that renders them pollutants. Also, by allowing the degradation of the quality of receiving waters, the consequences of Fidelity's interpretation of *APHETI* would upset the integrity of the CWA, a result that *APHETI* was careful to avoid. Fidelity's interpretation of *APHETI* is not correct, for it would allow someone to pipe the Atlantic Ocean into the Great Lakes and then argue that there is no liability under the CWA because the salt water from the Atlantic Ocean was not altered before being discharged into the fresh water of the Great Lakes. Or, water naturally laced with sulfur could be freely discharged into receiving water used for drinking water simply because the sulfur was not added to the discharged water. Such an argument cannot sensibly be credited.

Even though Fidelity argues that CBM discharges are "only water," other circuits have held that transporting water from one water body to another can violate the CWA. *See Miccosukee Tribe*, 280 F.3d at 1367 (affirming the district court's grant of summary judgment to the plaintiffs where the defendant discharged already polluted water into a navigable water even though the defendant did not introduce additional pollutants into the discharged water but only rerouted the discharged water into the receiving water); *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 492–93 (2d Cir. 2001) (concluding that the transfer of water containing pollutants from one body of water to another requires an NPDES permit); *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1299 (1st Cir.1996) (holding that the transfer of water from one body of water to another distinct body of water requires a NPDES permit where the discharged water contains pollutants).

Fidelity attempts to distinguish these cases because they addressed the issue of whether there was an "addition" of a pollutant under the CWA, not whether there was a pollutant. This distinction is inapposite. The issue of whether CBM water is a pollutant is practically indistinguishable from the issues considered by these cases. Fidelity is transporting water from the deep aquifers of the Powder Basin and discharging that unaltered water into the surface water of the Tongue River. Similarly, each of the cases cited above involve transport of water that could degrade the water quality of receiving waters. The cases apply insofar as they reject the argument that discharge of water cannot be a pollutant simply because the discharged water is unaltered and transported from one body of water to another.

In light of the CWA's definition of pollutant and pollution, our precedent in *APHETI*, and the conclusions of other circuits in analogous cases, we reject Fidelity's arguments and hold that CBM water is a pollutant pursuant to the CWA.

### III

■ Having concluded that Fidelity's discharge of CBM water is subject to the CWA, we next consider whether Fidelity nevertheless can be relieved of permitting under the CWA by Montana state law. Section 75–5–401(1)(b) of the Montana Code provides:

Discharge to surface water of groundwater that is not altered from its ambient quality does not constitute a discharge requiring a permit under this part if:

(i) the discharge does not contain industrial waste, sewage, or other wastes; (ii) the water discharged does not cause the receiving waters to exceed applicable standards for any parameters; and (iii) to the extent that the receiving waters in their ambient state exceed standards for any parameters, the discharge does not increase the concentration of the parameters.

Based on Montana Code section 75–5–401(1)(b), the MDEQ advised Fidelity that no permit was needed to discharge CBM water into the Tongue River. The district court agreed, reasoning that the EPA implicitly approved of Montana's groundwater exemption because the EPA did not revoke Montana's authority to operate the EPA-approved state permitting program despite section 75–5–401(1)(b). Giving def-

erence to the EPA's "approval" of Montana's permitting program, the district court concluded that discharge of CBM water does not require a permit under Montana state law and thus does not violate the CWA. We disagree with the district court's conclusion for several reasons.

■ First, though the district court reasoned that the EPA approved of section 75–5–401(1)(b), the EPA does not have the authority to exempt discharges otherwise subject to the CWA. Only Congress may amend the CWA to create exemptions from regulation. *See Am. Mining Congress v. E.P.A.*, 965 F.2d 759, 772 (9th Cir.1992) (citing *Natural Res. Def. Council v. Costle*, 568 F.2d 1369, 1374 (D.C.Cir. 1977)). The EPA could not have approved of the MDEQ's exemption of CBM water discharges under section 75–5–401(1)(b) even if the EPA wanted to do so.[4]

■ Second, Montana has no authority to create a permit exemption from the CWA for discharges that would otherwise be subject to the NPDES permitting process. *See* 33 U.S.C. § 1370 (states may not adopt or enforce standards that are less stringent than federal standards). Just as the EPA does not have the authority to create an exemption for unaltered groundwater, neither does the State of Montana, as the EPA cannot delegate to a state more authority than the EPA has under the CWA.[5]

---

4. Judicial deference to agency action is not warranted where the agency had no authority to act. *See United States v. Mead,* 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (*Chevron* deference applies only when Congress explicitly or implicitly gave the agency authority to fill certain gaps left by Congress). Therefore, the district court erred in giving judicial deference to the EPA's implicit "approval" of Montana's groundwater exemption. Congress did not grant the EPA the authority to create such exemptions.

5. Even if the EPA could have approved of the MDEQ's application of section 75–5–

401(1)(b), the EPA did not do so here. In a letter sent to the MDEQ, the EPA disapproved of the application of section 75–5–401(1)(b) to discharges that would otherwise be regulated under the CWA. The MDEQ, however, maintained that the exemption was consistent with the CWA because "discharges of unaltered, natural groundwater do not contain 'pollutants' as that term is defined" in the CWA. In a subsequent letter to the MDEQ, the EPA stated that revocation of Montana Code section 75–5–401(1)(b) would not be necessary *if* the MDEQ does not interpret that provision to authorize "any point source discharge of any

Moreover, absent statutory authority in the CWA for Montana to create such exemptions, it cannot possibly be urged that Montana state law in itself can contradict or limit the scope of the CWA, for that would run squarely afoul of our Constitution's Supremacy Clause. U.S. Const. art. VI, cl. 2. *See also Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 851 (9th Cir.2002) (recognizing that the Supremacy Clause "invalidates state laws that 'interfere with, or are contrary to,' federal law").

We hold that Montana state law cannot exempt CBM water from being subject to the CWA when the Act does not provide the EPA or the State of Montana the authority to create such exemptions.

## IV

Because CBM water is a pollutant subject to regulation by the CWA and because Montana cannot create an exemption for CBM water that is otherwise subject to the CWA, we reverse the district court's grant of summary judgment to Fidelity and remand with instructions to enter summary judgment for NPRC.

**REVERSED and REMANDED.**

pollutant to any water of the United States