CATSKILL MOUNTAINS CHAPTER OF TROUT UNLIMITED, INC., Theodore Gordon Flyfishers, Inc., Catskill–Delaware Natural Water Alliance, Inc., Federated Sportsmen's Clubs Of Ulster County, Inc. and Riverkeeper, Inc., Plaintiffs–Appellees–Cross–Appellants,

v.

CITY OF NEW YORK and New York City Department of Environmental Protection, Defendants–Third –Party–Plaintiffs–Appellants–Cross–Appellees,

Joel A. Miele, Sr., Commissioner of the Department of Environmental Protection, Defendant–Appellant–Cross–Appellee,

v.

State of New York, New York State Department of Environmental Conservation, and Erin M. Crotty, Commissioner of the New York State Department of Environmental Conservation, Third–Party–Defendants–Appellees.

Docket Nos. 03–7203(L), 03–7253(XAP).

United States Court of Appeals, Second Circuit.

Submitted: Nov. 21, 2005.

Decided: June 13, 2006.

---

Karl S. Coplan, Pace Environmental Litigation Clinic, Inc. (Kara E. Murphy, Legal Intern, on the brief), White Plains, NY, for Plaintiffs–Appellees–Cross–Appellants.

Hilary Meltzer, Assistant Corporation Counsel (Michael A. Cardozo, Corporation Counsel of the City of New York, William S. Plache, on the brief), New York, NY, for Defendants–Third–Party–Plaintiffs–Appellants–Cross–Appellees.

James M. Tierney, Assistant Attorney General (Eliot Spitzer, Attorney General of the State of New York, Michelle Aronowitz, Deputy Solicitor General, Peter H.

Lehner, Chief, Environmental Protection Bureau, Gordon J. Johnson, Deputy Bureau Chief, Robert H. Easton, Assistant Solicitor General, on the brief), Albany, NY, for Third–Party–Defendants–Appellees.

Before WALKER, Chief Judge, OAKES and JACOBS, Circuit Judges.

JOHN M. WALKER, JR., Chief Judge.

The City of New York ("the City") operates the Shandaken Tunnel ("Shandaken Tunnel" or "the Tunnel") as part of its water-management system that delivers drinking water to New York City and the immediate surrounding area. Water from the Tunnel, which is high in turbidity, discharges into the Esopus Creek ("Esopus Creek" or "the Creek"), a trout stream used for flyfishing and other recreational activities. The Catskill Mountains Chapter of Trout Unlimited, Inc., Theodore Gordon Flyfishers, Inc., Catskill–Delaware Natural Water Alliance, Inc., Federated Sportsmen's Clubs of Ulster County, Inc., and Riverkeeper, Inc. (collectively "Catskills") brought a citizen suit against the City, alleging that the City's use of the Tunnel without a permit violated the Clean Water Act ("CWA" or "Act"), 33 U.S.C. §§ 1251 et seq. In an October 21, 2001, opinion, we held that the CWA permit requirements apply to the Shandaken Tunnel discharges and remanded to the district court. On remand, the district court assessed a $5,749,000 civil penalty against the City and ordered the City to obtain a permit for the operation of the Tunnel. This appeal followed.

## BACKGROUND

### I. Relevant Clean Water Act Provisions

The purpose of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). As part of the program to achieve this goal, the Act states that "the discharge of any pollutant by any person shall be unlawful," *id.* § 1311(a), unless it is done in compliance with other provisions of the Act. One of those other provisions, the National Pollutant Discharge Elimination System ("NPDES"), *id.* § 1342(a), establishes a permit system. Under this provision, the Environmental Protection Agency ("EPA") or state administrators may issue a permit for the discharge of a pollutant at levels below the effluent limitations specified in the permit. *Id.* The CWA broadly defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." *Id.* § 1362(12).

Although the CWA establishes this federal permitting scheme, the Act also recognizes that states retain the primary role in planning the development and use of land and water resources, *id.* § 1251(b), allocating quantities of water within their jurisdictions, *id.* § 1251(g), and regulating water pollution, as long as those state regulations are not less stringent than the requirements set by the CWA, *id.* § 1370.

### II. The Shandaken Tunnel and the Esopus Creek

As part of the water system that supplies New York City with its drinking water, the City maintains the Schoharie Reservoir in the Catskill Mountains. To deliver this water eventually to New York City, water from the Schoharie Reservoir is diverted through the eighteen-mile Shandaken Tunnel and discharged into the Esopus Creek. The Creek's water, in turn, flows into the Ashokan Reservoir, through the Catskill Aqueduct, to a series of reservoirs and tunnels along the east side of the Hudson River, and eventually to New York City. Absent the man-made

diversion through the Tunnel, water from the Schoharie Reservoir would never reach the Esopus Creek. *Catskill Mountains Ch. of Trout Unltd. v. City of New York,* 273 F.3d 481, 484 (2d Cir.2001) ("*Catskills I*").

Because water in the Schoharie Reservoir contains suspended solids from both natural and man-made causes, discharges from the Tunnel into the Creek are more turbid[1] than the waters of the Esopus. This turbidity impairs use of the Esopus for fly fishing and other recreational activities. Pursuant to state regulations, the City has been studying ways to reduce the turbidity in the water discharged from the Tunnel but so far has failed to find a way to do so. Until this lawsuit, neither the EPA nor the New York State Department of Environmental Conservation ("NY-DEC"), the agency that enforces the CWA in New York State, had ever regulated the turbidity in the Tunnel under the CWA's permitting scheme.

### III. Procedural History

In March 2000, Catskills, recreational users of the Esopus Creek, brought this citizen suit under the CWA alleging that the City's discharge of turbid water from the Tunnel violated 33 U.S.C. § 1311(a), which, as we said, prohibits "the discharge of any pollutant" without a discharge permit. The district court dismissed the claim on the pleadings, holding that the discharge from the Tunnel did not constitute an "addition" of a pollutant to the Creek under 33 U.S.C. § 1362(12).

In October 2001, we reversed after concluding that the discharge of water containing pollutants from one distinct water body into another is an "addition of [a] pollutant" under the CWA. *Catskills I,* 273 F.3d at 491–93. As a result, we deter-

mined that the discharge from the Tunnel into the Creek requires a permit.

On remand from *Catskills I,* the district court granted summary judgment to the plaintiffs and went on to determine the civil penalties to be assessed against the City. The district court concluded that no penalties should be imposed for the City's actions prior to June 22, 2002, eight months after *Catskills I* put the City on notice that it needed a permit for the Shandaken discharges. Finding a delay of more than eight months unreasonable, however, the district court imposed the maximum penalty for the period from June 22, 2002, to December 31, 2002, when the City filed its permit application; the penalty totaled $5,749,000. This appeal followed.

### DISCUSSION

In this appeal, the City asks us to reconsider our holding in *Catskills I* that the discharge of turbid water from the Shandaken Tunnel into the Esopus Creek requires a permit. The City also argues that the penalty of $5,749,000 is too high. In a cross-appeal, Catskills argues that amount is too low.

We are free to reconsider our holding in *Catskills I* if there are cogent, compelling reasons for doing so, such as a change in controlling law or newly discovered facts. *United States v. Tenzer,* 213 F.3d 34, 39 (2d Cir.2000). Determining whether we should reconsider requires briefly revisiting our reasoning in *Catskills I.*

### I. Catskills I

In concluding that the transfer of turbid water from the Shandaken Tunnel to the Esopus Creek qualified as the "discharge of [a] pollutant," 33 U.S.C. § 1311(a), requiring an NPDES permit, *Catskills I* first

---

**1.** The parties do not contest that turbidity qualifies as a pollutant under the CWA.

noted the CWA's broad definition of the "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." *Id.* § 1362(12). Because the Shandaken Tunnel "plainly qualifies as a point source," *Catskills I,* 273 F.3d at 493, our holding rested, in principal part, on the meaning of "addition," which the CWA leaves undefined. We decided that "addition" means the introduction into navigable water from the "outside world," [2] with the outside world being defined as "any place outside the particular water body to which pollutants are introduced." *Id.* at 491.

In reaching this result, we distinguished the "dams cases," on which the City relied. In *National Wildlife Federation v. Gorsuch,* [3] 693 F.2d 156 (D.C.Cir.1982), and *National Wildlife Federation v. Consumers Power Co.,* [4] 862 F.2d 580 (6th Cir. 1988), two sister circuits held that water taken from a water source and then released back into that same source was not an "addition" to navigable waters under the CWA, despite the fact that the water so released contained "pollutants." 693 F.2d at 183, 862 F.2d at 587. This case differed from the dams cases, we believed, because the Tunnel discharges water into the Creek from a source that is a different, distinct body of water. *Catskills I,* 273 F.3d at 491–92. In *Catskills I,* we analogized the dams cases to a soup ladle scooping soup out of a pot and returning it to that pot, a type of water transfer known as an intrabasin transfer. The Tunnel's discharge, in contrast, was like scooping soup from one pot and depositing it in another pot, thereby adding soup to the second pot, an interbasin transfer. Interbasin transfers, we held in *Catskills I,* constitute "additions," rendering the City's reliance on the dams cases misplaced. *Id.* at 492.

We also rejected the City's "unitary water" theory of navigable waters, which posits that all of the navigable waters of the United States constitute a single water body, such that the transfer of water from any body of water that is part of the navigable waters to any other could never be an "addition." We pointed out that this theory would lead to the absurd result that the transfer of water from a heavily polluted, even toxic, water body to one that was pristine via a point source would not constitute an "addition" of pollutants and would not be subject to the CWA's NPDES permit requirement. *Id.* at 493. *Catskills I* rejected the "unitary water" theory as inconsistent with the ordinary meaning of the word "addition." *Id.*

Finally, we rejected the contention that the provisions of the CWA reserving power to the states could overcome the express permit requirement for water transfers that result in the addition of pollutants. We pointed out that "like many complex statutes ... the CWA bal-

**2.** This phrase comes from the definition of the word "addition" urged by the EPA on the court in *National Wildlife Federation v. Gorsuch,* 693 F.2d 156, 175 (D.C.Cir.1982). In *Gorsuch,* the EPA argued that an "addition of a pollutant" takes place only if the point source introduces a pollutant into the water from the outside world. *Id.*

**3.** *Gorsuch* involved water released from a dam that, due to its impoundment, had a low dissolved oxygen rate, variable water temperature, high concentrations of dissolved minerals and nutrients, increased sediment levels, and was supersaturated with air-attributes that can be harmful to downstream waters and the wildlife inhabiting them. *Id.* at 161–64.

**4.** *Consumers Power* involved water pumped from Lake Michigan through the turbines of a hydroelectric power plant and then released back into the lake—a process that pureed fish and other aquatic life and then released their remains as "pollutants" back into the lake. 862 F.2d at 583.

ances a welter of consistent and inconsistent goals" but that "none of the statute's broad purposes sways us from what we find to be the plain meaning of its text." *Id.* at 494.

## II.   Intervening Legal Developments

Following *Catskills I*, there have been two relevant legal developments. The Supreme Court decided *South Florida Water Management District v. Miccosukee Tribe of Indians*, 541 U.S. 95, 124 S.Ct. 1537, 158 L.Ed.2d 264 (2004), and the EPA issued an agency interpretation addressing the applicability of the CWA's NPDES permit requirement to water transfers such as the one at issue in this case.

*Miccosukee* was a citizen suit contending that an NPDES permit is necessary for the South Florida Water Management District to operate a pump that conveys water from a polluted canal to an undeveloped wetland. The pump serves both to prevent the basin surrounding the canal from flooding and to preserve the wetland area. *Id.* at 100–01, 124 S.Ct. 1537. Consistent with the dams cases, *Miccosukee* held that if the canal and the wetlands are not meaningfully distinct water bodies—an unresolved factual question—no NPDES permit is required. *Id.* at 112, 124 S.Ct. 1537; cf. *S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, 126 S.Ct. 1843, 1850 (2006) ("[I]f two identified volumes of water are 'simply two parts of the same water body, pumping water from one into the other cannot constitute an "addition" of pollutants.' "(quoting *Miccosukee*, 541 U.S. at 109, 124 S.Ct. 1537)).

On August 5, 2005, the EPA issued an agency interpretation regarding whether the movement· of pollutants by a water transfer from one navigable water to a separate one is the "addition" of a pollutant subjecting the activity to the NPDES permitting requirement. According to the

EPA, several provisions of the CWA indicate Congress's intent that such transfers be regulated by the states, not by the federal NPDES program. The EPA interpretation argues that, rather than primarily focusing on the meaning of the word "addition," as we did in *Catskills I*, a "holistic" view of the statute that takes this intent into account is appropriate.

The City concedes that this EPA interpretation is not entitled to *Chevron* deference. *See Chevron U.S.A., Inc. v. Natural Res. Def.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Instead, the deference described in *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), and *United States v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), is applicable. We thus defer to the agency interpretation according to its " 'power to persuade.' " *Mead,* 533 U.S. at 235, 121 S.Ct. 2164 (quoting *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161).

## III.   Reconsideration of *Catskills I*

We turn to the City's request that we reconsider our holding in *Catskills I*. Rather than offering "compelling and cogent" reasons for reconsideration, however, the City basically serves us warmed-up arguments that we rejected in *Catskills I*, with the additional contention that either the Supreme Court's *Miccosukee* decision, the EPA interpretation, or both compel a result different from the one we reached earlier. We disagree.

The City first argues that new evidence developed below and the Supreme Court's decision in *Miccosukee* invalidate the distinction between intrabasin and interbasin water transfers. The "new evidence" the City points to simply shows that the release of water from a dam into downstream water is no less likely to add pollutants as would a transfer of water from a distinct water body. Having considered

the dams cases in *Catskills I*, we were aware of the presence of pollutants in intrabasin transfers. *Gorsuch* includes an extensive discussion of the nature of water quality changes wrought by dammed water. 693 F.2d at 161–64. And in *Consumers Power*, the water at issue contained fish that were pulverized as they passed through the turbines of a hydroelectric power plant and then were reintroduced into Lake Michigan as biological waste. 862 F.2d at 582. Nonetheless, *Catskills I* concluded that, despite the presence of pollutants in both interbasin and intrabasin transfers, interbasin transfers are properly distinguished because they "add" pollutants to the navigable waters. See *Catskills I*, 273 F.3d at 492. This has not changed.

Nor does the Supreme Court's decision in *Miccosukee* render inter- and intra-basin transfers indistinguishable. *Miccosukee* cited with approval our "soup ladle" analogy and the distinction between inter- and intra-basin transfers. 541 U.S. at 109–10, 124 S.Ct. 1537. The Court remanded the case to the district court to determine whether the water bodies in question were "two pots of soup, not one." Id.; cf. *S.D. Warren Co.*, 126 S.Ct. at 1850 n. 6. This remand would be unnecessary if there were no legally significant distinction between inter- and intra-basin transfers.

The City also reasserts the unitary-water theory of navigable waters. Our rejection of this theory in *Catskills I*, however, is supported by *Miccosukee*, not undermined by it. In that case, the Supreme Court pointed out that several provisions of the CWA seem to distinguish among water bodies that are part of the navigable waters of the United States, implying that, at least in the context of the CWA, the unitary-water theory has no place. 541 U.S. at 105–09, 124 S.Ct. 1537. *Miccosukee* also noted that the EPA has never endorsed the theory in any administrative documents. Id. at 107, 124 S.Ct. 1537. Indeed, the Supreme Court pointed out that "the agency once reached the opposite conclusion." Id. Thus, *Miccosukee* did no more than note the existence of the theory and raise possible arguments against it. This does not constitute a change of controlling law warranting reconsideration of this court's previous decision on the issue.

Finally, the City points to the "holistic" argument, reflected in the EPA's 2005 agency interpretation,[5] to assert that the proper allocation of rights and responsibilities between the states and the federal government for water regulation necessitates a reconsideration of our holding in *Catskills I*. This proposition is supported by amicus curiae briefs filed by western states who fear that the *Catskills I* rule will upend state regulation of water rights.

The argument relies on sections 101(g) and 510 of the CWA, 33 U.S.C. §§ 1251(g), 1370, both of which expressly reserve the authority of states over the water within their jurisdiction, as well as section 304(f) of the CWA, 33 U.S.C. § 1314(f), which governs non-point-source pollution. Section 101(g) provides that "the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired." Section 510 states that "[e]xcept as expressly provided in this chapter, nothing in this chapter shall ... be construed as im-

---

5. As noted above, the EPA's agency interpretation is entitled to deference only insofar as it has the power to persuade. See *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161. Because the EPA and the City assert the same contentions on this point, we address the City and the EPA's position as one. For reasons discussed below, we do not find the argument persuasive and therefore decline to defer to the EPA.

pairing or in any manner affecting any right or jurisdiction of the States with respect to the waters . . . of such States." Because, according to the City, there are no feasible means of reducing the pollution in the Tunnel, a permit requirement would effectively amount to a ban on the transfer of water from the Tunnel to the Creek and thereby interfere with New York's statutory water allocation rights.

■ This argument, too, was raised by the City in *Catskills I*, albeit less elaborately, and, as with the interbasin/intrabasin distinction and the unitary-waters theory, *Miccosukee* fails to alter the legal landscape to support the "holistic" theory. The power of the states to allocate *quantities* of water within their borders is not inconsistent with federal regulation of water *quality*. Section 510 provides for the preservation of the preexisting rights of states not in conflict with the other requirements of the CWA ("except as expressly proved in this chapter"). Indeed, the Supreme Court has held that "[s]ections 101(g) and 510(2) preserve the authority of each State to allocate water quantity as between users; they do not limit the scope of water pollution controls. . . ." *PUD No. 1 v. Wash. Dep't of Ecology*, 511 U.S. 700, 720, 114 S.Ct. 1900, 128 L.Ed.2d 716 (1994). To be sure, *Miccosukee* acknowledged the possibility that "construing the NPDES program to cover such transfers would . . . raise the costs of water distribution prohibitively, and violate" section 101(g). *Miccosukee*, 541 U.S. at 108, 124 S.Ct. 1537. But in the next sentence, the Court recognized that, despite their potential cost, such permits nevertheless might be necessary to protect water quality. *Id.*

Nor does *Miccosukee* support the EPA and the City's argument that the non-point-source provisions of the CWA indicate congressional intent to leave interbasin water transfers outside the NPDES permitting scheme. Section 304(f) of the CWA directs the EPA to study and make recommendations for the regulation of pollutants spread by non-point sources, such as "changes in the movement, flow, or circulation of any navigable waters or ground waters, including changes caused by the construction of . . . flow diversion facilities." 33 U.S.C. § 1314(f)(2)(F). From this language, the EPA and the City claim that Congress intended that changes in the circulation of navigable waters caused by the construction of "flow diversion facilities," such as the Tunnel, be exempt from the permit requirements that apply to point sources. As the Supreme Court pointed out in *Miccosukee*, however, "1314(f)(2)(F) does not explicitly exempt nonpoint pollution sources from the NPDES program if they *also* fall within the 'point source' definition." 541 U.S. at 106, 124 S.Ct. 1537.

In the end, while the City contends that nothing in the text of the CWA supports a permit requirement for interbasin transfers of pollutants, these "holistic" arguments about the allocation of state and federal rights, said to be rooted in the structure of the statute, simply overlook its plain language. NPDES permits are required for "the discharge of any pollutant," 33 U.S.C. § 1311(a), which is defined as "any addition of any pollutant to navigable waters from any point source," *id.* § 1362(12). It is the meaning of the word "addition" upon which the outcome of *Catskills I* turned and which has not changed, despite the City's attempts to shift attention away from the text of the CWA to its context. In *Catskills I*, we pointed out that complex statutes often have seemingly inconsistent goals that must be balanced. 273 F.3d at 494. The CWA seeks to achieve water allocation goals as well as to restore and maintain

the quality of the nation's waters. The City and the EPA would have us tip the balance toward the allocation goals. But in honoring the text, we adhere to the balance that Congress has struck and remains free to change.

The City's final argument for reconsideration is that other provisions of federal and state law are more appropriate means of regulating the water discharged from the Shandaken Tunnel. The City points to the Safe Drinking Water Act, which limits the levels of contaminants that are allowed in public drinking water; section 303(d) of the CWA, which regulates pollution levels resulting from pollution from both point and non-point sources; and various provisions of state law that regulate water quality. While these provisions no doubt contribute to the goals of pollution reduction and regulation, the City does not explain how their existence invalidates a separate, independent requirement imposed by the permitting scheme of the CWA.

The City's plea for reconsideration appears to rest upon the assumption that regulating the discharge from the Tunnel would effectively require that the flow be stopped altogether. This claim seems to us exaggerated. We think the flexibility built into the CWA and the NPDES permit scheme, a flexibility that the City has endorsed in a related proceeding,[6] will allow federal authority over quality regulation and state authority over quan-

tity allocation to coexist without materially impairing either.

We conclude this section with a somewhat detailed and technical accounting of the flexibilities that exist. Effluent limitations contained in NPDES permits fall into two categories: technology-based effluent limits [7] ("TBELs") and water-quality-based effluent limits ("WQBELs").[8] Where, as here, no applicable national TBELs have been set, the permit-writer may set TBELs using best professional judgment. See 33 U.S.C. § 1342(a)(1)(B); 40 C.F.R. § 125.3. In doing so, NYDEC will consider the available technologies, costs in relation to effluent reduction benefits, engineering aspects of various control techniques, available best management practices, and non-water-quality environmental impacts. See 40 C.F.R. § 125.3(c), (d). This process thus affords the permit-writer "considerable flexibility in establishing permit terms and conditions." EPA, NPDES Permit Writers' Manual 69 (1996). Only if the TBELs established by the NYDEC prove insufficient to achieve the water quality standards set by the state for the Esopus Creek [9] will more stringent WQBELs be adopted. 33 U.S.C. § 1312(a); 40 C.F.R. § 122.44(d).

If the City is unable to comply with the effluent limitations adopted by the NYDEC, CWA provisions and implementing regulations still provide means of enabling

---

**6.** The City has acknowledged the NPDES system's flexibility in hearings related to its permit application. See In re Application of the New York City Department of Environmental Protection, DEC Application No. 3–5150–00420/00001, 2005 N.Y. Env. Lexis 40, at *24, *26 (June 22, 2005) (Ruling on Issues and Party Status).

**7.** Technology-based limits are based on the effluent levels that can be achieved through the use of various water treatment technologies. See 40 C.F.R. § 125.3.

**8.** Water-quality-based limits are those limits needed to ensure the appropriate water quality of the receiving water body. That water quality is specified by the state in which the water body is located.

**9.** With respect to turbidity for water bodies like the Esopus Creek, New York's water quality standards require that there be "[n]o increase that will cause a substantial visible contrast to natural conditions." N.Y. Comp. Codes R. & Regs. tit. 6, § 703.2.

the NYDEC to issue a valid permit to the City. The permit may include a schedule of compliance, allowing the permittee to achieve compliance over time. 33 U.S.C. § 1362(17); 40 C.F.R. § 122.47. Indeed, the current draft permit prepared by the NYDEC in this case includes a compliance schedule that requires the City to investigate both technological and structural solutions to the turbidity problem and to implement those solutions according to a specified schedule. *See* NYS Env. Notice Bulletin, Notice of Completed Application for Shandaken Tunnel Outlet 7–9 (August 4, 2004).

Second, the NYDEC may allow a variance to WQBELs if the permittee demonstrates that achieving the effluent limitation contained in the permit is not feasible. 40 C.F.R. § 131.13; N.Y. Comp.Codes R. & Regs. tit. 6, § 702.17(b).[10] A variance is temporary and must include conditions to assure that the permittee makes "reasonable progress ... toward achieving the [original] effluent limitations." *Id.* § 702.17(e)(2). It may be renewed subject to the same requirements. *Id.* § 702.17(g). Because the City is investigating means of reducing the turbidity of the Tunnel's discharge pursuant to state requirements, a temporary variance might well provide the time necessary to implement any reasonable and feasible solutions to the turbidity problem.

The draft Shandaken Tunnel permit issued by the NYDEC on August 4, 2004,

illustrates additional flexibilities. The draft permit varies turbidity level restrictions by season, accepting higher levels at times when the natural turbidity level of the Creek is higher; it also contains exemptions from the effluent limitations when necessary to avoid drought conditions, to remedy emergency threats, to avert threats to public health or safety, or to allow repairs to the Schoharie Reservoir. *See* NYS Env. Notice Bulletin, Notice of Completed Application for Shandaken Tunnel Outlet 3, 4 n. 2 (August 4, 2004).

The draft permit shows that the NPDES permit scheme can ensure that the water discharged from the Shandaken Tunnel will continue to meet the City's needs without unnecessarily sacrificing progress toward water quality goals. We find the City's position, that federal regulation of interbasin water transfers will lead to the termination of those transfers in contravention of the rights explicitly reserved to the states, to be alarmist and unwarranted.

At bottom, the City's arguments for reconsideration of our holding in *Catskills I* are simply embellishments of those made in that case. Neither these arguments nor any intervening developments lead us to conclude that our earlier holding was reached in error or should otherwise be modified. We note that every other court faced with this issue has reached the same conclusion. *See N. Plains Res. Council v. Fidelity Exploration & Dev. Co.,*[11] 325

---

10. Under N.Y. Comp.Codes R. & Regs. tit. 6, § 702.17, the City might be eligible for a variance on the basis that its compliance with the existing standard is precluded by "naturally occurring pollutant concentrations," *id.* § 702.17(b)(1); "human-caused ... sources of pollution," *id.* § 702.17(b)(3); "dams, diversions or other types of hydrologic modifications," *id.* § 702.17(b)(4); or the fact that compliance would "result in substantial and

widespread economic and social impact," *id.* § 702.17(b)(6).

11. *Northern Plains* held that the discharges of groundwater derived from the extraction of coal bed methane into a river requires an NPDES permit. The court reasoned that the alteration of the chemical integrity of the river resulting from those discharges constituted an addition of a pollutant because such groundwater would not have flowed into the

F.3d 1155 (9th Cir.2003); *Miccosukee Tribe of Indians v. S. Fla. Water Mgmt. Dist.,*[12] 280 F.3d 1364 (11th Cir. 2002); *Dubois v. U.S. Dep't of Agric.,*[13] 102 F.3d 1273 (1st Cir.1996). While we recognize the incremental administrative burden our interpretation entails, we have little doubt that it nevertheless permits the City to deliver drinking water to its citizens while furthering the CWA's goal to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

## IV. Civil Penalty

▮ Both sides attack the $5,749,000 civil penalty imposed on the City by the district court. District courts have broad discretion in calculating civil penalties under the CWA. *See Tull v. United States,* 481 U.S. 412, 427, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987) (noting that "highly discretionary calculations that take into account multiple factors are necessary in order to set civil penalties under the Clean Water Act"); *United States v. Smithfield Foods, Inc.,* 191 F.3d 516, 526 (4th Cir. 1999); *Hawaii's Thousand Friends v. Honolulu,* 821 F.Supp. 1368, 1395 (D.Haw. 1993). A district court's findings of fact in support of a CWA penalty are reviewed for clear error, *e.g., Smithfield Foods, Inc.,* 191 F.3d at 526; *Sierra Club, Lone Star Ch. v. Cedar Point Oil Co.,* 73 F.3d 546, 573 (5th Cir.1996); *Pub. Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals, Inc.,* 913 F.2d 64, 79 (3d Cir.1990), and the district court's determination of the penalty based on those facts is reviewed for abuse of discretion, *e.g., Smithfield Foods,* 191 F.3d at 526; *Sierra Club,* 73 F.3d at 573. In calculating civil penalties under the CWA, the court may begin either with the violator's estimated economic benefit from noncompliance (known as the "bottom-up" method) or with the statutory maximum allowable penalty (known as the "top-down" method). *E.g., Smithfield Foods,* 191 F.3d at 528 & n. 7; *United States v. Mun. Auth. of Union Twp.,* 150 F.3d 259, 265 (3d Cir.1998). This starting figure then may be adjusted after considering the six factors enumerated in section 309(d) of the CWA: (1) the seriousness of the violations; (2) the economic benefit resulting from the violation; (3) any history of violations; (4) good-faith efforts to comply with applicable requirements; (5) the economic impact of the penalty on the violator; and (6) other matters as justice may require. 33 U.S.C. § 1319(d). *E.g., Sierra Club,* 73 F.3d at 551, n. 7. The court below opted to use the "top-down" method. Although neither party objected to this general approach, both sides take issue with the details of its implementation.

The district court began with the maximum statutory penalty and reduced that number due to factors mitigating in the City's favor. First, the district court found that the seriousness factor mitigated in favor of the City. Second, because the City's belief that it did not need a permit to operate the Tunnel was reasonable until the October 2001 decision of this court, the district court determined that the City

river but for the company's methane extraction processes. 325 F.3d at 1163.

12. Before the Supreme Court granted certiorari in *Miccosukee,* the Eleventh Circuit held that the transfer of water that was high in phosphorus from a canal to a wetlands area required an NPDES permit. 280 F.3d at 1366, 1368–69.

13. *Dubois* held that, when a ski area pumped water from a polluted river and discharged it into a pristine pond into which it otherwise would not have flowed as part of a snow-making process, an NPDES permit was required for the discharge. 102 F.3d at 1296–99.

should not be penalized for its history of violations. Third, the district court credited the City's ongoing efforts to reduce the turbidity of the water in the Tunnel pursuant to non-CWA regulation and its eventual application for a NPDES permit as indicating a good-faith effort to comply with applicable requirements. Finally, the district court considered the City's reasonable belief that a CWA permit was not necessary to be a mitigating factor.

Catskills faults the district court for its determination that the seriousness factor mitigated in favor of the City. This determination was based on three considerations: the pollution at issue resulted from natural conditions that caused turbidity and not toxic pollutants; there was no evidence that downstream fish were adversely affected by the discharge; and finally, the discharge, while turbid, actually improved the habitat for trout by raising low water levels. Because these findings have evidentiary support, we will not disturb them or the district court's conclusion that, taken together, they were a mitigating factor.

■ Both parties take issue with the district court's June 22, 2002, starting date for penalties, after which the court imposed the maximum penalty. Catskills argues that the starting date should have been October 21, 2001, the date of *Catskills I*, while the City contends that December 2002 would have been reasonable and that, in any event, the mitigating factors should have reduced the penalty imposed after the starting date. The district court did impose the maximum daily penalty, but for only about nine per cent of the period for which the district court could have penalized the City.[14] The district

court's choice of starting date accounted both for a reasonable time for the City to come into compliance with the CWA and for the mitigating factors; it will be sustained.

Both parties also attack the penalty figure based on the "economic benefit resulting from the violations" factor. The City argues that it is receiving no economic benefit from operating the Tunnel without a permit, so this factor should be treated as a mitigating factor. Catskills, on the other hand, argues that the City reaped a benefit by not having to build a filtration plant to screen the turbidity from the Tunnel's water, which Catskills says would cost $27 million. Even assuming the feasibility of such a plant, as to which the district court was skeptical, the district court found that construction of the plant would not have begun until 1995 at the earliest. Therefore, only costs that would have been incurred after that date, a figure considerably below $27 million, would be appropriately considered. In addition, there is a substantial question as to whether the City should be faulted for not building a plant during a period (prior to *Catskills I*) in which it did not believe it was in violation of the CWA. Considering the evidence on both sides of this issue, the district court did not abuse its discretion in determining that the issue of cost savings to the City from not building a plant should be deemed neither a mitigating factor nor a cause for increased penalties.

Finally, Catskills challenges the City's good faith belief that it did not need a permit to operate the Tunnel. The district court's determination that the City had such a good faith belief, based on credibility assessments, is deserving of deference and nothing in the record leads us to ques-

---

14. Catskills filed its complaint on March 31, 2000. Because the CWA has a five-year statute of limitations, 28 U.S.C. § 2462, that is tolled sixty days before the filing of a complaint, *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1524 (9th Cir.1987), January 30, 1995, is the date on which the City became liable for penalties.

tion it. Neither the EPA nor the NYDEC had ever indicated the necessity of a permit. The district court's decision not to penalize the City for a reasonable, albeit incorrect, interpretation of a statute is not an abuse of discretion.

In arriving at the penalty imposed below, the district court carefully considered the six factors laid out in section 309(d) of the CWA, relied on facts not clearly erroneous, and did not abuse its discretion in deciding the penalty. We have, however, uncovered a calculation error. The district court stated that the maximum statutory penalty for the final 131 days of 2002 was $31,500 per day. In fact, the maximum daily penalty remained $27,500 until March of 2004. 40 C.F.R. § 19.4. Thus, the maximum possible penalty was $62,725,000, not $63,249,000 as stated by the district court. Had the district court been aware that its initial calculation of the statutory maximum was $524,000 too high, it might have reduced the penalty by that amount. Or, even being aware of the true statutory maximum, it might have imposed the same penalty. Or it might have arrived at a penalty somewhere in between. Because we have no way to determine how the district court's calculation of the penalty would have differed, if at all, had it accurately determined the maximum statutory penalty, we remand the case for recalculation of the penalty in light of the true statutory maximum.

## CONCLUSION

For the foregoing reasons, we affirm the district court's judgment except as to the amount of the civil penalty imposed on the City of New York and remand the case to the district court to recalculate that penalty.