# FILED

December 16 2008

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 07-0755

## IN THE SUPREME COURT OF THE STATE OF MONTANA

### 2008 MT 425

PENNACO ENERGY, INC., MARATHON OIL COMPANY,
ST. MARY'S LAND & EXPLORATION COMPANY, and
YATES PETROLEUM CORPORATION,

      Plaintiffs and Appellants,

  v.

MONTANA BOARD OF ENVIRONMENTAL REVIEW,
MONTANA DEPARTMENT OF ENVIRONMENTAL QUALITY,
NORTHERN PLAINS RESOURCE COUNCIL, and TONGUE
RIVER WATER USERS' ASSOCIATION,

      Defendants and Appellees.

APPEAL FROM:    District Court of the Twenty-Second Judicial District,
In and For the County of Big Horn, Cause No. DV 2006-068
Honorable Blair Jones, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

          Ronald F. Waterman, Gough, Shanahan, Johnson & Waterman,
          Helena, Montana

          L.B. Cozzens, Cozzens Law Office, Billings, Montana

          John C. Martin, Duane A. Siler, Michele L. Walter, Patton Boggs, LLP,
          Washington, D.C.

      For Appellees Montana Board of Environmental Review and Montana
      Department of Environmental Quality:

          Hon. Mike McGrath, Montana Attorney General, Jennifer Anders,
          Sarah A. Bond, Assistant Attorneys General, Helena, Montana

          Claudia Massman, Department of Environmental Quality,
          Helena, Montana

For Appellee Northern Plains Resource Council:

Jack R. Tuholske, Tuholske Law Office, P.C., Missoula, Montana

For Appellee Tongue River Water Users Association:

Brenda Lindlief Hall, Reynolds Motl & Sherwood, PLLP,
Helena, Montana

Submitted on Briefs:  October 16, 2008

Decided:  December 16, 2008


Filed:


_____
Clerk

2

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1    The Plaintiffs and Appellants in this matter are Pennaco Energy, Marathon Oil, Nance Petroleum and Yates Petroleum (collectively Pennaco). The Defendants and Appellees are Montana Board of Environmental Review (BER or the Board) and Montana Department of Environmental Quality (DEQ). Defendant Intervenors are Northern Plains Resource Council (NPRC) and Tongue River Water Users' Association (TRWUA).

¶2    This case arises from the regulation of the discharge into state waterways of salty water produced from coal bed methane (CBM) production. This water is called "CBM produced water." CBM produced water, which contains naturally high levels of sodium and salts, is frequently discharged by industries to surface waters. As a result, the water quality of the receiving waters can be degraded. Additionally, when land is subsequently irrigated with surface water mixed with CBM produced water, there is a potential threat to the irrigated agriculture as the salt from the water may accumulate in the plants' root systems and impair plant growth. In recognition of this potential impact, the State regulates the discharge of two harmful components of CBM produced water—sodium adsorption ratio (SAR[1]) and electrical conductivity (EC[2]). The EPA is currently studying

---

[1] SAR is the concentration of sodium relative to calcium and magnesium in water.
[2] EC—electrical conductivity of water means the ability of water to conduct an electrical current at 25 degrees C. It is expressed as microSiemens per centimeter ($\mu$S/cm) or micromhos/centimeter ($\mu$mhos/cm) or equivalent units and is corrected to 25 degrees C. Admin. R. M. 17.30.602(9). Electrical conductivity of water samples is used as an indicator of how salt-free or impurity-free the sample is; the purer the water, the lower the conductivity.

the coal bed methane sector to determine if federal effluent guidelines for these parameters are appropriate. 71 Fed. Reg. 76644, 76656 (Dec. 21, 2006).

¶3 In both 2003 and 2006, BER revised its rules regulating EC and SAR. Pennaco challenged these revised rules in the Twenty-Second Judicial District Court. BER filed a motion for summary judgment and Pennaco filed a cross-motion for summary judgment. The District Court granted BER's motion and denied Pennaco's. On appeal, Pennaco challenges the standard of review applied by the District Court, as well as the court's conclusions that BER did not fail to comply with relevant rules in promulgating new standards for EC and SAR. We affirm.

## ISSUES

¶4 A restatement of the issues presented on appeal is:

¶5 Did the District Court erroneously apply a standard of review that was too deferential and inapplicable to agency rulemakings?

¶6 Did the District Court err in concluding that BER was authorized to designate EC and SAR harmful in 2006 when BER had refused to do so in 2003?

¶7 Did the District Court err in concluding that BER's revised rule was not "more stringent" than federal law, and therefore BER was not statutorily required to issue written findings of fact?

## FACTUAL AND PROCEDURAL BACKGROUND

¶8 Marathon Oil Company, a Delaware corporation with headquarters in Houston, Texas, engages in worldwide exploration and production of crude oil and natural gas, as well as domestic refining, marketing, and transportation of petroleum products.

4

Marathon holds leases for oil and gas production in Montana. Pennaco is a wholly owned subsidiary of Marathon and is actively pursuing coal bed natural gas development in the Powder River Basin (the Basin) in Wyoming. Nance Petroleum and Yates Petroleum are out-of-state corporations also pursuing coal bed natural gas development in the Basin in Montana and Wyoming.

¶9 To produce coal bed natural gas, a well is drilled into the selected coal seam. On the surface of the coal are molecules of methane gas, held in place by water pressure from a coal seam aquifer. In order to release the natural gas, the water pressure must be released. This is accomplished by pumping water out of the coal seam which causes the methane to detach from the coal and rise to the surface. The regulations imposing restrictions on the discharge of this pumped water are the source of this dispute.

¶10 The federal Clean Water Act, enacted in 1972 (the Act), delegates the responsibility for enforcing the Act to states that meet specific criteria. States are required to enact water protection laws consisting of three elements: establishment of a "designated use" for each water body—e.g., recreation, irrigation, etc.; establishment of numeric or narrative water quality standards for each water body designed to prevent impairing the water quality for that particular use; and adoption of a nondegradation policy to maintain and protect a state's water resources. 40 C.F.R. §§ 131.10, 131.11, and 131.12.

¶11 Between 1972 and 2003, EC and SAR, among other parameters, were regulated in Montana exclusively by narrative standards, as opposed to numeric standards. The Administrative Rules of Montana (ARMs) set forth a general prohibition against

5

discharging substances that create concentrations or combinations of materials which are toxic or harmful to human, animal, plant or aquatic life, or that would produce undesirable aquatic life. Admin. R. M. 17.30.637(1)(d)-(e). The State also established a nondegradation policy for its water. Admin. R. M. 17.30.705. "Degradation" is "a change in water quality that lowers the quality of high-quality waters for a parameter. The term does not include those changes in water quality determined to be nonsignificant pursuant to 75-5-301(5)(c)." Section 75-5-103(5), MCA. Additionally, the ARMs specify that "degradation" "is defined in 75-5-103, MCA, and also means any increase of a discharge that exceeds the limits established under or determined from a permit or approval issued by the department prior to April 29, 1993." Admin. R. M. 17.30.702(3). "High-quality waters" are defined as "all state waters, except: . . . surface waters that: are not capable of supporting any one of the designated uses for their classification . . . ." Section 75-5-103(10)(b)(i), MCA. The State established specific criteria for determining whether an activity would result in nonsignificant changes in existing water quality. Admin. R. M. 17.30.715. With some exception for changes in the quality of water for any parameter for which there were only narrative water quality standards (i.e., EC and SAR before 2003), any changes that would not have a measurable effect on any existing or anticipated use or cause measurable changes in aquatic life or ecological integrity were viewed as insignificant and would not trigger a nondegradation review. Admin. R. M. 17.30.715(1)(g) and (2).

¶12 In early 2000, at the behest of the Water Pollution Control Advisory Council, DEQ began investigating the effect of CBM produced water on soils and stream life to

6

determine whether to implement numeric standards for this type of discharge. In May 2002, DEQ completed two alternative draft rules, both of which set a range of numeric water quality standards for EC and SAR on the rivers and streams in the Powder River Basin. Both proposals were accompanied by technical support documents explaining the rationale and scientific basis for the proposed rules.

¶13 In early June 2002, NPRC, TRWUA and other Powder River Basin water rights holders filed a petition for rulemaking urging BER to adopt numeric standards for EC and SAR. BER put out three proposals for public comment and held two public meetings. Industry opposed the numeric standards arguing that the existing narrative standard was sufficient. While the public comment period was open, BER received extensive information from scientists and technical people, the EPA, environmental groups and irrigators.

¶14 In 2003, BER adopted numeric standards for EC and SAR for three rivers and a creek making up the Powder River Basin. Admin. R. M. 17.30.670. These standards established specific levels for EC and SAR discharges into the waters of the Basin from November 1 through March 1 each year. They also established lower levels of allowable discharges from March 2 through October 31. In addition, the Board expressly provided that the nonsignificance criteria that were in place at that time and applied to parameters regulated by narrative standards *only*, would continue to apply to EC and SAR, despite the fact that EC and SAR would now have numeric standards. It rejected irrigators' requests to designate EC and SAR as "harmful" parameters at that time but agreed to explore a method of tracking natural EC to address nondegradation issues. The effect of

employing numeric criteria for the discharge of EC and SAR but retaining the narrative "nonsignificant" criteria for nondegradation review of these parameters was to potentially allow discharges that could degrade water quality up to the numeric water quality standard.

¶15 In 2005, NPRC and a group of irrigators filed another petition for rulemaking asking BER to adopt rules to require treatment of CBM produced water. They also requested again that BER designate EC and SAR as "harmful" parameters. BER put this out for public comment and held three hearings and a public meeting. In May 2006, BER rejected the proposal to require treatment but designated EC and SAR as "harmful."

¶16 In June 2006, Pennaco challenged the validity of the EC and SAR water quality standards promulgated by BER in 2003 and 2006. It filed an action in the Twenty-Second Judicial District Court under Montana Administrative Procedure Act (MAPA), Montana Declaratory Judgment Act (MDJA), Montana Water Quality Act (WQA) and Montana Environmental Policy Act (MEPA) seeking to invalidate the 2003 and 2006 rules adopted by BER. Pennaco claimed the 2003 rules had no sound scientific basis. Pennaco also claimed BER and DEQ failed to prepare a MEPA-required environmental impact statement (EIS). In February 2007, BER moved for summary judgment asserting that no genuine issues of material fact existed and that the administrative record showed that it had validly exercised its authority to issue the challenged rulemakings. In April 2007, Pennaco filed a cross-motion for summary judgment arguing that BER had not validly exercised its authority because the rulemakings were not supported by the required sound, scientific justification. After briefing and joint submission of Agreed

8

Facts, the court held oral argument in July 2007. In October 2007, the District Court granted BER's motion and denied Pennaco's cross-motion. Pennaco appeals.

## STANDARDS OF REVIEW

¶17 We review a district court's grant of summary judgment de novo, and apply the same criteria applied by the district court pursuant to M. R. Civ. P. 56(c). A district court properly grants summary judgment only when no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law. *Sampson v. National Farmers Union Property*, 2006 MT 241, ¶ 7, 333 Mont. 541, ¶ 7, 144 P.3d 797, ¶ 7 (citation omitted).

¶18 An agency's conclusions of law are reviewed to determine if they are correct. This same standard of review is applicable to both the district court's review of the administrative decision and our subsequent review of the district court's decision. *Indian Health Board v. Mont. Dept. of Labor*, 2008 MT 48, ¶ 11, 341 Mont. 411, ¶ 11, 177 P.3d 1029, ¶ 11.

## DISCUSSION

¶19 *Did the District Court erroneously apply a standard of review that was too deferential and inapplicable to agency rulemakings?*

¶20 In the District Court's 33-page decision, the court acknowledged that Pennaco brought this action under multiple statutes—MAPA, §§ 2-4-101 to -711, MCA, MDJA, §§ 27-8-101 to -313, MCA, the Montana WQA, §§ 75-5-101 to -1126, MCA, and MEPA, §§ 75-1-101 to -1112, MCA. The court cited § 2-4-506(2), MCA, which is within the Judicial Notice and Declaratory Rulings section of MAPA, and provides that a court may

9

declare an administrative rule invalid only if "the rule was adopted with an arbitrary or capricious disregard for the purpose of the authorizing statute." Citing § 2-4-305(6), MCA, in the Adoption and Publication of Rules section of MAPA, the court explained that a rule comports with the administrative procedure act if it is (a) consistent and not in conflict with the applicable statute, and (b) reasonably necessary to effectuate the purpose of the statute.

¶21 The District Court also determined that an agency decision involving "substantial agency expertise" must be reviewed to determine whether the agency acted arbitrarily, capriciously or unlawfully. Relying on *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989) and *North Fork Pres. v. Dept. of State Lands*, 238 Mont. 451, 458-59, 778 P.2d 862, 867 (1989), the court noted that when we reviewed an agency's decision to forego an EIS, we applied an arbitrary, capricious or unlawful standard. The District Court also explained how to review an agency decision for arbitrariness or capriciousness, again relying on both U.S. Supreme Court and Montana Supreme Court authority. Applying these standards, the District Court held that, based on BER's underlying statutory authority (also analyzed by the court), the agency rulemakings were consistent with supportive scientific data and the authorizing statutes. The court found that the 2003 rules were motivated by BER's concerns of projected CBM development in the Powder River Basin[3] and the difficulty for DEQ staffers to objectively and consistently translate the existing narrative standards. The court determined that the

---

[3] The record indicates that EPA predicted that 9,551 CBM wells will be operating in the Basin by 2010 resulting in the discharge of millions of gallons of CBM production water per day into the Basin's river system.

10

protection mandated by both federal and state water laws warranted proactive measures by BER.

¶22 On appeal, Pennaco claims the District Court mistakenly applied the standard of review in the declaratory judgment provisions of MAPA when it should have applied the standard set forth in the section of MAPA for the adoption and publication of rules. Additionally, Pennaco maintains that WQA requires that "rules should be adopted only on the basis of sound, scientific justification" and the Board should "seriously consider the impact of the proposed rule." Pennaco summarizes the applicable rules and asserts that under MAPA and WQA, the District Court was required to consider whether the 2003 and 2006 rules were: (1) based on serious consideration of their impact; (2) adopted *only* on the basis of sound, scientific justification and *not* on the basis of projections and conjecture; (3) consistent with and not in conflict with the statute; and (4) reasonably necessary to effectuate the purposes of the WQA. It opines that failure to satisfy any of these substantive standards mandated that the District Court declare the rules invalid.

¶23 Pennaco argues that the District Court should have first looked to the substantive standards in part 3 of MAPA, i.e., the Adoption and Publication of Rules section, to discern if the rules met the required substantive standards. It opines that the rules did not comply because they had no "sound scientific basis." Pennaco maintains that only after determining if the substantive standards are satisfied should the court then look to part 5 of MAPA and specifically to § 2-4-506(1) and (2), MCA, to determine if either provision would allow a finding of invalidity. Pennaco maintains that by going first to

11

§ 2-4-506(2), MCA, (and without consideration of subsection (1)), the District Court overlooked the actual and correct standard of review in part 3.

¶24 Pennaco also posits that the court's determination of the standard of review was erroneously based on cases from this Court that did not involve either agency rulemakings or challenges under MAPA. It further claims that the court ignored applicable cases addressing agency rulemaking. Relying on *Bell v. Dept. of Licensing*, 182 Mont. 21, 23, 594 P.2d 331, 333 (1979), and *Board of Barbers, Etc. v. Big Sky College, Etc.*, 192 Mont. 159, 161, 626 P.2d 1269, 1270 (1981), Pennaco argues that this Court has stated that the "MAPA test of 'reasonable necessity to effectuate the purposes of the statute' should be applied." Pennaco maintains that the application of the wrong standard of review requires this Court to vacate and remand for "the more searching review demanded by MAPA and the WQA."

¶25 Pennaco also asserts that the District Court failed to heed our directive that it give less deference to agency interpretations that are inconsistent or recent, and that the Board's decision to "flip-flop" and reverse its consistent thirty-year-old narrative approach to regulating EC and SAR was not entitled to the critical deference given it by the District Court. Pennaco claims that BER's decision to classify EC and SAR as "harmful" parameters in 2006 was a direct reversal of its 2003 decision to not do so. It argues that the 2006 decision lacked scientific support and therefore is invalid.

¶26 Pennaco proffers that application of the incorrect standard of review lowered the threshold for demonstrating the validity of the rules. It maintains that it provided the District Court with substantial evidence showing that BER had no sound scientific basis

for its 2003 and 2006 rulings but by applying the wrong standard of review the court gave too much deference to BER's rulemaking decisions. It asserts that a numeric limit for EC and SAR was unnecessary because scientific studies showed that CBM-related discharges had not and would not adversely impact the state's water quality; therefore, the narrative standard was adequate to protect the state's water.

¶27 Pennaco also argues that the District Court misinterpreted the standard it employed; the standard was not simply "arbitrary and capricious," but rather an "arbitrary and capricious disregard for the purpose of the authorizing statute."

¶28 BER counters that Pennaco failed to identify any clear error by the District Court and therefore failed to meet the burden of establishing reversible error. Furthermore, the Board asserts that the adoption of the numerical standards for EC and SAR was timely, necessary, scientifically and EPA supported. BER claims that it "was inundated with science" during the 2003 public comment period and that the adopted numeric standards fell within the range of science presented.

¶29 BER posits that § 2-4-302, MCA, governs adoption of rules and *not* the review of those rules by the judicial branch. BER reiterates that the standard propounded by Pennaco—whether the rules: (1) were based on sound science (WQA); (2) were reasonably necessary (MAPA); and (3) not in conflict with the statute (MAPA)—was actually employed by the District Court when it considered the matter in the manner required by § 2-4-506(2), MCA. While BER does not disagree with Pennaco's argument vis-à-vis recent or inconsistent rulings, it claims that it is inapplicable here as BER had sound reasons for reevaluating protections to the Basin's water system from these

13

parameters based on projected significant CBM development. BER opines that this Court should not expand judicial review of agency decisions to include reweighing the science, second-guessing BER and substituting our decision for that of the Board.

¶30 Furthermore, BER defends the District Court's reliance on the standard of review applied in various administrative cases which Pennaco argued was inapposite. The Board avers that *Winchell v. DNR*, 1999 MT 11, 293 Mont. 89, 972 P.2d 1132, *Johansen v. State*, 1999 MT 187, 295 Mont. 339, 983 P.2d 962 (*Johansen II*), *Johansen v. State, Dept. of Natural Resources*, 1998 MT 51, 288 Mont. 39, 955 P.2d 653 (*Johansen I*), and *North Fork*, involve judicial review of a final agency decision where no review was specifically provided under MAPA. These cases, BER submits, illustrate that judicial review is limited, especially when the court is reviewing an agency decision that requires substantive agency expertise.

¶31 Intervenors NPRC and TRWUA assert that MAPA does not contain an explicit standard of review for administrative rules as it does for contested cases; therefore, absent such an explicit standard, the District Court correctly drew guidance from § 2-4-506(2), MCA, and from administrative law decisions issued by this Court. They argue that the District Court was correct because Pennaco failed to show how numeric standards are inconsistent with the protective purposes of state and federal water quality laws. Under the CWA, the Montana WQA and the Montana Constitution, establishment of water quality standards and nondegradation requirements is required pursuant to BER's duty to protect the environment. They maintain that under any standard of review adopted by

14

this Court, the District Court correctly upheld BER's adoption of the 2003 and 2006 rules.

¶32 Intervenors suggest that the 2003 rule adopting numeric criteria but retaining the narrative nonsignificant criterion for nondegradation review violated the nondegradation policy and was constitutionally suspect. As a consequence, they argue, BER's 2006 designation of these pollutants as "harmful" corrected this error by establishing a numeric nondegradation standard for EC and SAR which resulted in the similar treatment of all parameters for which numeric criteria had been established.

¶33 Pennaco replies that MAPA gave rise to this cause of action, not the MDJA, and therefore MAPA's standard of review controls. It posits that the declaratory judgment provisions do not *give rise* to a cause of action; rather, they simply allow a court to declare the rights, liabilities, and remedies of the parties once a court resolves the dispute. Pennaco proffers that if the standard in the MDJA applied there would be no point to MAPA having a standard of review since parties challenging agency actions typically plead declaratory judgment as a basis for relief.

¶34 Pennaco clarifies that it is not arguing that BER was precluded from switching to a numeric nondegradation criterion after retaining the narrative criteria in 2003; rather, it is arguing that before reversing its previous rejection of the numeric nondegradation criteria, the WQA required BER to provide a sound scientific justification for its action. Changing its position on "policy" grounds (to provide that EC and SAR not be treated differently from other parameters controlled by numeric criteria) does not satisfy the requirement for a "sound scientific justification." Nevertheless, argues Pennaco, even if

15

BER could appropriately rely on a policy reason, its policy justifications are unpersuasive. Under the narrative standards in effect between 2003 and 2006, BER already had the authority to limit discharges of EC or SAR to levels that did not cause further degradation of the receiving waters.

¶35 We conclude the District Court applied an appropriate standard of review to BER's 2003 and 2006 rulemakings. The court's decision specifically addressed the factors in § 2-4-305(6)(a) and (b), MCA, in that the rules were consistent with the requirements of the CWA and the WQA, and were reasonably necessary to effectuate the purpose of the statute, i.e., the protection of the state's waters, particularly in light of the projected growth of the CBM sector in the Basin and DEQ's difficulty in issuing objective and consistent discharge permits. The court found that BER reviewed copious scientific data and relied on this data to draft rules that had sufficient scientific justification, thereby finding that WQA's mandate for "sound, scientific justification" was met. Additionally, based on consideration of all the circumstances, the court determined that BER had not adopted rules with an "arbitrary and capricious disregard for the purpose of the statutes." This determination satisfied the requirements of § 2-4-506, MCA. Given the multiplicity of Acts under which Pennaco sought review (see ¶ 16), the standard of review assembled by the District Court from these different sources was not erroneous under the circumstances with which it was presented. For these reasons, we affirm the District Court's application of an appropriate standard of review.

16

¶36    *Did the District Court err in concluding that BER was authorized to designate EC and SAR harmful in 2006 when BER had refused to do so in 2003?*

¶37    In response to Pennaco's complaints that BER had no scientific justification in 2006 to reverse its previous decision rejecting requests to classify EC and SAR as "harmful" parameters, the District Court determined that BER's classification of EC and SAR as "harmful" was consistent with the federal CWA in that it was designed to protect uses and high quality water. The court also concluded "what the BER did in 2006 was treat discharges of EC and SAR for purposes of nondegradation review in the same manner as all other constituents for which there are numeric standards." The court recognized that BER held public hearings, received significant comments, and clearly articulated its reasons for changing its position and that BER's ruling was "entirely consistent with the legislative directive to establish 'objective and quantifiable criteria for various parameters.' "

¶38    On appeal, Pennaco maintains that the lack of scientific justification for the reversal in position renders the rule invalid. BER counters that it is charged with protecting the state's water under both the CWA and Montana's WQA. It maintains that it had sufficient scientific evidence to support imposition of numeric criteria in 2003 and that this same scientific data supported its 2006 decision to re-classify EC and SAR as "harmful." Moreover, it defends its decision on the ground that re-classification of the two parameters resulted in the uniform treatment of all parameters for which numeric criteria had been established, rather than the irregular regulation of EC and SAR that resulted from the 2003 ruling. BER asserts that this policy change was within its

17

authority, was supported by scientific data, and was required to protect high quality waters in Montana from degradation. BER's rationale for its decision appears in its Notice of Amendment issued in May 2006:

> The board finds that EC and SAR should be categorized as "harmful" for the purpose of implementing Montana's nondegradation policy. The board notes that the intent of Montana's nondegradation policy is to protect the increment of "high quality" water that exists between ambient water quality and the numeric water quality standards. . . . Given that numeric standards have been adopted for EC and SAR, the board is uncomfortable with the inconsistency of the current "narrative" classification of EC and SAR, which is used solely for parameters for which no numeric standards have been adopted. Since all other parameters with numeric water quality standards are classified as either carcinogenic, toxic, or harmful, the board believes that EC and SAR should be treated in a similar manner.

¶39 We are not persuaded by Pennaco's argument that BER's decision should be afforded decreased deference by virtue of the fact that it is a reversal of an earlier decision. Pennaco relies for this argument upon *National Wildlife Fed. v. Nat'l Marine Fish. Serv.,* 422 F.3d 782 (9th Cir. 2005), in which the U. S. Court of Appeals stated "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference,' than a consistently held agency view." *National Wildlife,* 422 F.3d at 799. However, we conclude that *National Wildlife* is inapposite. In that case, the district court found invalid two NMFS opinions issued over a period of four years. In its second opinion, according to the court, the agency had directly reversed its earlier opinion, but erroneously failed to take account of several significant factors in doing so. Here, by contrast, BER's decision to classify EC and SAR as "harmful" for purposes of nondegradation review was not as much a reversal

18

of an earlier decision as it was a recognition that it had created an inconsistent regulatory scheme with its 2003 rules. Moreover, while rejecting a 2003 request to classify these parameters as harmful at the time, BER had expressly agreed to continue studying the effects of these pollutants. Upon learning that its 2003 rule potentially allowed dischargers to discharge a level up to the numeric standards regardless of the background level of these parameters in the receiving waters, BER revised its rule to create consistency of regulation and protect the Basin's water.

¶40 We conclude that BER was authorized to classify EC and SAR as "harmful" under its mandate to protect the waters of Montana and to achieve regulatory consistency with other parameters for which numeric standards had been adopted. While this may have been a policy-based decision, there appears to be adequate scientific justification in the rulemaking record. This rule protected high quality water by requiring permit writers to stop short of allowing degradation up to the standard; it was reasonably necessary to ensure consistency in permitting and protection of the receiving waters, and it was consistent with the authorizing statutes. The District Court did not err in so concluding.

¶41 *Did the District Court err in concluding that BER's revised rule was not "more stringent" than federal law, and therefore BER was not statutorily required to issue written findings of fact?*

¶42 Finally, Pennaco argues that BER was statutorily required to issue written findings because it adopted rules that were more stringent than corresponding federal rules. The District Court rejected this argument, as do we.

¶43 The District Court noted that DEQ issued two legal opinions to BER stating that neither the 2003 numeric water quality standard nor the 2006 nonsignificance criteria

19

were more stringent than comparable or corresponding federal regulations. The court rejected Pennaco's argument that when EPA approved the earlier-promulgated "narrative" water quality standard (presumably around 1972), the narrative standard became the federal standard so that the adoption of numeric standards constituted a "more stringent" standard. The court similarly rejected Pennaco's argument that when EPA approved the narrative nonsignificance criteria in 2003, this became the federal standard. The District Court stated that Pennaco offered no legal authority for its proposition that EPA's *approval* of state narrative standards "federalizes" such standards in such a way as to trigger the "written justification" requirement in the Montana statutes. The District Court determined that neither the plain language of the statutes nor the legislative histories supported Pennaco's interpretation. It further concluded that §§ 75-5-203 and -309, MCA, requiring such written findings, were triggered by EPA-promulgated regulations or criteria, not mere approval of a state standard. The court concluded that because there were no corresponding federal numeric standards for EC or SAR, BER's adoption of numeric standards was not "more stringent" than a federal standard. The court further opined that the classification of EC and SAR as "harmful" parameters was consistent with the federal CWA rather than "more stringent" or in conflict with federal requirements. Accordingly, because the 2006 classification was not more stringent than or in conflict with federal standards, no additional written findings were required.

¶44 We find no fault with the District Court's analysis. We disagree with Pennaco's argument that EPA's approval of BER's revised rules in 2003 established federal criteria

for EC and SAR, the subsequent revision of which would constitute a more stringent standard triggering written findings. Furthermore, we find no authority to support a conclusion that BER's classification of EC and SAR as "harmful" parameters and the consequential nondegradation review rule constitute a "more stringent" standard in light of the fact that EPA has not adopted a corresponding standard. The revised rule is consistent with 40 C.F.R. § 131.11(a)(1) which requires states to adopt water quality standards to protect designated uses:

> 131.11(a) Inclusion of pollutants: (1) States must adopt those water quality criteria that protect the designated use. Such criteria must be based on sound scientific rationale and must contain sufficient parameters or constituents to protect the designated use. For waters with multiple use designations, the criteria shall support the most sensitive use.

¶45 In addition, BER's 2006 nondegradation rule appears to be consistent with EPA's antidegradation policy at 40 C.F.R. § 131.12, which provides in relevant part:

> (a) The State shall develop and adopt a statewide antidegradation policy and identify the methods for implementing such policy pursuant to this subpart. The antidegradation policy and implementation methods shall, at a minimum, be consistent with the following:

> (1) Existing instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected.

> (2) Where the quality of the waters exceed levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water, that quality shall be maintained and protected unless the State finds, after full satisfaction of the intergovernmental coordination and public participation provisions of the State's continuing planning process, that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located. In allowing such degradation or lower water quality, the State shall assure water quality adequate to protect existing uses fully. Further, the State shall assure that there shall be achieved the highest statutory and regulatory

21

requirements for all new and existing point sources and all cost-effective and reasonable best management practices for nonpoint source control.

¶46 Lastly, while not determinative of our decision here, we note that subsequent to the District Court proceedings in this matter, the EPA issued a letter on February 29, 2008, approving BER's revision to the nondegradation provision in ARM 17.30.670(6), and stating that the revised rule was consistent with the requirements of the CWA and EPA's antidegradation provisions codified at 40 C.F.R. § 131.12. EPA stated:

> The revised water quality standards amend Montana's nondegradation requirements applicable to [EC and SAR] for the . . . Powder River [Basin]. The revision to ARM 17.30.670(6) classifies EC and SAR as "harmful" parameters for the purposes of making nonsignificance determinations for high quality waters. Specifically, the revised rule now reads: "EC and SAR are harmful parameters for the purposes of the Montana Water Quality Act, Title 75, Chapter 5, MCA." EC and SAR, therefore, now will be subject to the nonsignificance criteria in ARM 17.30.715(l)(f), which provides, in part, that changes in high quality waters will be considered nonsignificant where ". . . changes outside of a mixing zone designated by the department are less than 10% of the applicable standard and the existing water quality level is less than 40% of the standard."

Thus, EPA expressly approved BER's 2006 nondegradation rule as being consistent with its mandates.

¶47 Based on the record, the District Court correctly concluded that BER's 2003 and 2006 rules have a scientific basis, are reasonably necessary to effectuate the purpose of the applicable statutes, are consistent and not in conflict with the relevant statutes, have not been adopted with an arbitrary and capricious disregard for the purpose of the authorizing statutes, and are consistent with and not more stringent than EPA's antidegradation policy.

¶48    For the foregoing reasons, we affirm the District Court.


                                        /S/ PATRICIA COTTER


We concur:

/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS
/S/ JAMES C. NELSON
/S/ JIM RICE