

DA 09-0131

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 111

NORTHERN CHEYENNE TRIBE, a federally
recognized Indian tribe, TONGUE RIVER WATER
USERS' ASSOCIATION, and NORTHERN PLAINS
RESOURCE COUNCIL, INC.,

     Plaintiff-Intervenor and Appellants,

  v.

MONTANA DEPARTMENT OF ENVIRONMENTAL
QUALITY; RICHARD OPPER, in his official capacity
as Director of the Montana Department of Environmental
Quality; and FIDELITY EXPLORATION & PRODUCTION
COMPANY,

     Defendants and Appellees.

APPEAL FROM:    District Court of the Twenty-Second Judicial District,
In and For the County of Big Horn, Cause No. DV 06-34
Honorable Blair Jones, Presiding Judge

COUNSEL OF RECORD:

     For Appellants:

     Brenda Lindlief-Hall, Reynolds, Motl and Sherwood, PLLP, Helena, Montana
(Tongue River)

     Jack R. Tuholske (argued), Tuholske Law Office, Missoula, Montana (Northern
Plains)

     James L. Vogel, Vogel & Wald, PLLC, Hardin, Montana (Northern Cheyenne)

     John B. Arum and Brian C. Gruber (argued), Ziontz, Chestnut, Varnell, Berley &
Slonim, Seattle, Washington (Northern Cheyenne)

     For Appellees:

Claudia L. Massman (argued), Special Assistant Attorney General, Helena, Montana (DEQ)

Jon Metropoulos (argued) and Dana L. Hupp, Gough, Shanahan, Johnson & Waterman, PLLP, Helena, Montana (Fidelity)

Argued:    January 13, 2010
Submitted: January 14, 2010
Decided:   May 18, 2010

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 Northern Cheyenne Tribe (Tribe), a federally recognized Indian tribe, Tongue River Water Users' Association (TRWUA), and Northern Plains Resource Council, Inc. (NPRC) (collectively Appellants), appeal the order of the Twenty-Second Judicial District Court, Big Horn County, granting summary judgment to the Montana Department of Environmental Quality (DEQ), Richard Opper, Director of DEQ, and Fidelity Exploration & Production Company (Fidelity). We reverse and remand.

¶2 We review the following dispositive issue on appeal:

¶3 *Whether DEQ violated the Clean Water Act or the Montana Water Quality Act by issuing discharge permits to Fidelity without imposing pre-discharge treatment standards?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶4 Appellants live and work along the Tongue River in southeastern Montana. The Tongue River rises in Wyoming and flows north through Big Horn and Rosebud counties to its confluence with the Yellowstone River. The Tribe holds reserved water rights on the Tongue River and uses this water for irrigation, stockwater, recreation, and cultural uses. Members of TRWUA and NPRC rely on the high quality waters of the Tongue River for irrigation, domestic use, and stockwater. Fidelity extracts Coal Bed Methane (CBM), a form of natural gas, for commercial sale near the Tongue River. Large underground coal seams permeate this part of Montana.

¶5 The pressure of groundwater in these underground coal seams traps CBM. Fidelity draws groundwater from the subterranean coal seams in order to extract CBM. CBM

3

extraction releases significant amounts of groundwater to the surface of the earth. Fidelity must dispose of the groundwater drawn to the surface. CBM producers dispose of the groundwater in a variety of ways. Fidelity discharges the groundwater at issue into the Tongue River.

¶6 The groundwater associated with CBM extraction contains a naturally high saline content. The highly saline groundwater may degrade the quality of the receiving surface waterway. Surface waters degraded by CBM discharge water, in turn, may have an adverse affect on irrigated agriculture and aquatic life. In fact, federal law defines the discharge water associated with CBM extraction as a "pollutant" under the Clean Water Act (CWA). *Northern Plains Resource Council v. Fidelity Exploration & Dev. Co.*, 325 F.3d 1155, 1160 (9th Cir. 2003).

¶7 This designation as a "pollutant" requires a CBM producer to obtain a National Pollutant Discharge Elimination System (NPDES) permit in order to release the water into receiving waters. *Northern Plains Resource Council*, 325 F.3d at 1160; 33 U.S.C. § 1342 (§ 402). NPDES permits impose conditions and limitations on the discharge of pollutants. The Environmental Protection Agency (EPA) administers NPDES permits unless a state has enacted its own enforcement program, in which case EPA's Administrator (the Administrator) must have approved the state's program. 33 U.S.C. §§ 1341, 1342 (§§ 401, 402). Montana has chosen to administer its own permit program. Section 75-5-402, MCA; Mont. Admin. Rule 17.30.101. DEQ administers the Montana Pollutant Discharge

Elimination System (MPDES) permitting program. Section 75-5-211, MCA; Admin. R. M. 17.30.1201.

¶8      Fidelity began discharging untreated CBM water into the Tongue River without a permit in August 1998. *Northern Plains Resource Council*, 325 F.3d at 1158-59. DEQ authorized the discharge without a permit pursuant to § 75-5-401(1)(b), MCA, between August 1998 and when DEQ issued Fidelity a permit in June 2000. Section 75-5-401(1)(b), MCA, allows unpermitted discharge to surface waters if the discharge does not alter the ambient water quality. EPA notified DEQ in 1998 that § 75-5-401(1)(b), MCA, conflicts with the CWA, and that DEQ must follow NPDES permitting requirements for Fidelity's discharge. *Northern Plains Resource Council*, 325 F.3d at 1159. DEQ resisted EPA's attempt to revoke the exemption under § 75-5-401(1)(b), MCA, and continued to allow Fidelity to discharge into the Tongue River.

¶9      Fidelity filed for MPDES permits in January 1999 despite DEQ's advisement. *Northern Plains Resource Council*, 325 F.3d at 1159. NPRC filed an action in federal district court in June 2000 in which it challenged Fidelity's lack of compliance with the NPDES permitting requirements. DEQ altered its position and issued Fidelity an MPDES permit for the discharge of CBM water into the Tongue River. DEQ issued the permit to Fidelity in 2000 shortly after NPRC had filed its action. *Northern Plains Resource Council*, 325 F.3d at 1159. The permit allowed Fidelity to discharge untreated CBM water into the Tongue River. Fidelity applied to renew this permit in 2004 in conjunction with its application for a second permit.

5

¶10     DEQ issued Fidelity its second MPDES permit in 2006 along with the renewed permit for the original discharge.  The second permit required Fidelity to treat a portion of its CBM discharge water and "blend" this treated wastewater with untreated wastewater before discharging it into the Tongue River.  DEQ measures the salinity levels of CBM discharge water by its electric conductivity (EC) and its sodium absorption ratio (SAR).  Admin. R. M. 17.30.602(9) and (27).  DEQ imposes conditions on MPDES permits based upon EC and SAR measurements.  DEQ imposed effluent limitations on Fidelity's MPDES permits in the form of water quality standards.

¶11     DEQ's water quality standards impose *discharge* rate restrictions based upon EC and SAR calculations.  Water quality standards look to the change in ambient water quality in the receiving waterway to ascertain acceptable levels of pollutant discharge under the CWA.  *EPA v. Cal. ex rel. State Water Resources Control Bd.*, 426 U.S. 200, 202, 96 S. Ct. 2022, 2023-24 (1976).  These water quality standards guide polluter performance based upon "tolerable effects" of pollutant discharge.  *EPA*, 426 U.S. at 202, 96 S. Ct. at 2023.  In other words, water quality standards allow producers to discharge pollutants into a waterway up to a tolerable level.  DEQ opted to impose these water quality discharge rate restrictions rather than to impose uniform pre-discharge treatment standards.

¶12     Pre-discharge treatment standards—often referred to as technology-based effluent limitations—focus on "preventable causes" and *treatment* of pollutants before discharge into a receiving waterway.  *EPA*, 426 U.S. at 202, 96 S. Ct. at 2024. Producers treat wastewater before discharging it into a receiving waterway under pre-discharge treatment standards.

6

Pre-discharge treatment standards seek to minimize effluent discharge through specified levels of treatment. This pre-discharge treatment system makes it "unnecessary to work backward from an overpolluted body of water to determine which point sources are responsible." *EPA*, 426 U.S. at 204, 96 S. Ct. at 2024.

¶13 The Montana Board of Environmental Review (BER) promulgates rules related to water quality standards and industry-wide effluent limitations. Section 75-5-201, MCA; § 75-5-305, MCA. BER created a Water Quality Standard in 2003 specifically to control and limit CBM discharge water's saline characteristics and its negative impacts on Montana's waters and water users.

¶14 BER promulgated a narrative "nonsignificance" threshold for EC and SAR during the 2003 rulemaking process. DEQ considered the discharge nonsignificant under this narrative standard if the EC and SAR did not have a "measurable effect" on existing uses in the receiving waterway and there was no "measurable change" in aquatic life in the receiving waterway. Admin. R. M. 17.30.760(6) (2003). These rules exempted the MPDES permit from nondegradation review, though otherwise required by Federal and Montana law, if the EC and SAR fell below the nonsignificance threshold. See 40 C.F.R. § 131.12(a)(2); § 75-5-303, MCA; Admin. R. M. 17.30.701 *et seq*.

¶15 DEQ evaluated both of Fidelity's MPDES permit applications under the 2003 rule that classified the discharge as nonsignificant thereby avoiding nondegradation review. DEQ finally approved both of Fidelity's MPDES permits in 2006. BER was in the process of revising its 2003 rule at the time. BER declined entreaties to adopt pre-discharge treatment

standards for CBM. BER concluded that pre-discharge treatment standards would not be "technologically, economically, and environmentally feasible, as required by § 75-5-305(1), MCA." BER's 2006 revisions of the nonsignificance rule instead designated EC and SAR as "harmful parameters." BER classified EC and SAR as harmful parameters to implement Montana's nondegradation policy to protect Montana's "high quality" waters. The Montana Water Quality Act (WQA) designates the Tongue River a "high quality" waterway. Section 75-5-103(13), MCA. BER adopted the new rule one month after DEQ had approved Fidelity's permits.

¶16     Appellants challenged DEQ's issuance of the MPDES permits. Appellants alleged that DEQ had violated the CWA and the WQA by failing to include pre-discharge treatment standards in both permits. Appellants further alleged that DEQ had failed to undertake a nondegradation review, and that DEQ and Fidelity had violated their right to a clean and healthful environment under the Montana Constitution. Finally, Appellants claimed that the environmental assessment prepared for Fidelity's permits had failed to comply with the Montana Environmental Policy Act's (MEPA) requirement of considering a range of alternatives, including a no action alternative.

¶17     The parties submitted cross-motions for summary judgment and the District Court heard oral argument on February 28, 2007. The court granted summary judgment to DEQ and Fidelity on all four claims on December 9, 2008. The District Court determined that DEQ properly had used water quality standards instead of pre-discharge treatment standards in evaluating Fidelity's permits. The court reasoned that the water quality standards ensured

8

compliance with Montana's Water Quality Standard and the 2003 nonsignificance rule. The court noted that the CWA afforded DEQ discretion to use pre-discharge treatment standards or water quality standards in the absence of adoption of federal standards by EPA. Appellants appeal.

## STANDARD OF REVIEW

¶18 We review *de novo* a district court's grant of summary judgment and apply the same criteria applied by the district court under M.R. Civ. P. 56(c). *Pennaco Energy, Inc. v. Mont. Bd. of Envtl. Review*, 2008 MT 425, ¶ 17, 347 Mont. 415, 199 P.3d 191. A district court properly grants summary judgment only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Pennaco*, ¶ 17.

¶19 We review for correctness an agency's conclusions of law. *Pennaco*, ¶ 18. The same standard of review—correctness—applies to the district court's review of the administrative agency's decision, and our subsequent review of the district court's decision. *Pennaco*, ¶ 18.

## DISCUSSION

¶20 *Whether DEQ violated the Clean Water Act or the Montana Water Quality Act by issuing discharge permits to Fidelity without imposing pre-discharge treatment standards?*

### The CWA – Structure and Intent

¶21 Congress enacted the CWA in 1948 with the goal of *eliminating* the discharge of pollutants in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. 1251(a) (§ 101). Congress developed the NPDES permit system to achieve this goal. 33 U.S.C. §§ 1342 and 1311 (§§ 402 and 301).

9

¶22 Congress amended the CWA in 1972 to make pre-discharge treatment standards the centerpiece of the NPDES permit system. Sen. Rpt. 92-414 at 3675 (Oct. 28, 1971). Pre-discharge treatment standards prevent degradation of water quality by requiring treatment before discharging wastewater into the receiving waterways. The 1972 revisions sought to achieve enforcement through implementation of pre-discharge treatment standards "because the previous water-quality based approach to pollutant control had been 'limited in its success.'" *Our Children's Earth Found. v. EPA*, 527 F.3d 842, 847-48 (9th Cir. 2008); Sen. Rpt. 92-414 at 3675. Congress determined that water quality standards had proven ineffective because they did not govern adequately the conduct of individual polluters. *EPA*, 426 U.S. at 202, 96 S. Ct. at 2023-24.

¶23 Congress reaffirmed its commitment to pre-discharge treatment standards as the foundation of water quality regulation in the 1985 amendments to the CWA. Congress cited the "historical ineffectiveness of the previous water-quality-based approach" and the "immediate and effective method of achieving the goals of the Act" through the use of pre-discharge treatment standards. *Our Children's Earth Found.*, 527 F.3d at 848 (citing Sen. Comm. Print 3-4 (1985)).

¶24 We review the District Court's determination that the Administrator possesses discretion whether to impose pre-discharge treatment standards against this backdrop. The District Court agreed with DEQ's claim that § 402(a)(1) of the CWA grants discretionary authority to the Administrator. The court determined further that § 402 imposes no

10

mandatory duty on the Administrator or the states to require pre-discharge treatment standards.

## The Non-Discretionary Requirements of Sections 402 and 301

¶25 The Administrator establishes effluent limitations in one of two ways once the Administrator decides to grant a permit under § 402(a)(1)(A) or (B). The Administrator may promulgate guidelines for an entire class of industry when operating under § 402(a)(1)(A). 33 U.S.C. § 1314(b) (§ 304(b)). In the alternative, the Administrator may establish effluent limitations geared to the particular exigency of an individual permit application under § 402(a)(1)(B). The Fifth Circuit in *Texas Oil & Gas Assn v. EPA*, 161 F.3d 923 (5th Cir. 1998), determined that, "in practice," compliance with the language of § 402(a)(1)(B) "means that EPA must determine on a case-by-case basis what effluent limitations represent the BAT [best available technology] level." *Texas Oil*, 161 F.3d at 928-29.

¶26 The Administrator must use its "best professional judgment" in determining the BAT on a case-by-case basis. *Texas Oil*, 161 F.3d at 928-29. EPA's best professional judgment in determining the BAT "thus take[s] the place of uniform national guidelines" otherwise promulgated under § 402(a)(1)(A). *Texas Oil*, 161 F.3d at 929. The technology-based standard under § 402(a)(1)(B) "remains the same," however, even in the absence of uniform national standards. *Texas Oil*, 161 F.3d at 929. As a result, individual NPDES permits must adhere to § 402(a)(1)(B) when EPA has not yet promulgated these industry-wide guidelines. *Texas Oil*, 161 F.3d at 928-29.

11

¶27    EPA has yet to promulgate industry-wide guidelines for CBM. 74 Fed. Reg. 68599, 68607 (Dec. 28, 2009). In the interim, EPA must incorporate pre-discharge treatment standards on a case-by-case basis for the CBM industry pursuant to the mandate under § 402(a)(1)(B) that require the use of BAT. *Texas Oil*, 161 F.3d at 928-29. DEQ argues, nevertheless, that the absence of industry-wide standards for CBM leaves the actual use of pre-discharge treatment standards in the NPDES permitting process to the discretion of the Administrator.

¶28    DEQ correctly notes that the language in § 402 of the CWA allows that the Administrator "may" issue permits for pollutant discharge. 33 U.S.C. § 1342. Once the Administrator decides to issue a permit, however, it may be granted only upon condition that such discharge will meet all applicable requirements under §§ 301, 302, 306, 307, 308, and 403, or "such conditions as the Administrator determines are necessary to carry out the provisions of the Act." 33 U.S.C. § 1342(a)(1)(A)-(B). Sections 402 and 301 operate in tandem: § 402 grants the Administrator authority to issue NPDES permits and § 301 enumerates the conditions and limitations that each permit must contain. *E.P.A. v. National Crushed Stone Assn*, 449 U.S. 64, 71, 101 S. Ct. 295, 301 (1980).

¶29    Section 301 provides that the discharge of any pollutant shall be unlawful unless otherwise provided by the section. 33 U.S.C. § 1311(a). Section 301 requires the implementation of "effluent limitations" to carry out the objective of minimizing pollutant discharge. 33 U.S.C. § 1311(b)(1)(A)-(2)(A). The plain language of § 301(b)(1)(A)-(2)(A) requires the effluent limitations to use pre-discharge treatment standards in the absence of

12

federal guidelines. 33 U.S.C. § 1311(b)(1)(A)-(2)(A). Further, § 306 of the CWA requires that new sources of pollution, such as Fidelity's, use the "best available demonstrated control technology." 33 U.S.C. § 1316(a)(1)-(2).

¶30 The statutory framework of the CWA "requires" the Administrator to enforce pre-discharge treatment standards on individual discharges from point sources when granting NPDES permits. *PUD No. 1 of Jefferson Co. v. Wash. Dept. of Ecology*, 511 U.S. 700, 704, 114 S. Ct. 1900, 1905 (1994). This duty to impose pre-discharge treatment standards remains non-discretionary. *PUD No. 1*, 511 U.S. at 704, 114 S. Ct. at 1905. Courts have interpreted § 402(a)(1)(B) to require the Administrator to impose pre-discharge treatment standards on a case-by-case basis for industries such as CBM. *Texas Oil*, 161 F.3d at 928-29.

¶31 Section 301 ensures that the Administrator impose pre-discharge treatment standards under § 402's permitting system. It becomes apparent from our review of the CWA and decisions interpreting it that Congress intended to impose pre-discharge treatment standards in every NPDES permit issued under the CWA. This requirement furthers the CWA's goal of "eliminating" pollutant discharge into our Nation's waterways. 33 U.S.C. 1251(a)(1).

### State Mandates Under the CWA and Its Implementing Regulations

¶32 We now must determine whether the CWA imposes the same pre-discharge treatment requirement on those states that administer their own permitting systems. EPA has promulgated pre-discharge treatment regulations pursuant to the mandate from § 301(b). *National Crushed Stone Assn*, 449 U.S. at 71, 101 S. Ct. at 301. Implementation of the

13

CWA's enforcement provisions involves a "complex statutory and regulatory scheme" that implicates both federal and state administrative responsibilities. *PUD No. 1*, 511 U.S. at 704, 114 S. Ct. at 1905. EPA's regulations explain the related duties of states and the Administrator in the permitting process.

¶33 Any NPDES permit granted under § 402 requires the discharger to "meet all the applicable requirements specified in the regulations issued under § 301." *National Crushed Stone Assn*, 449 U.S. at 71, 101 S. Ct. at 301. EPA regulations mandate that the pre-discharge treatment requirements under § 301(b) of the CWA "represent the *minimum* level of control that *must* be imposed in a permit issued under section 402 of the Act." 40 C.F.R. § 125.3(a) (emphasis added). The regulation requires that the permit writer "shall apply" pre-discharge treatment standards "[o]n a case-by-case basis under section 402(a)(1) of the Act." 40 C.F.R. § 125.3(c)(2)-(d); *See also Texas Oil*, 161 F.3d at 928-29.

¶34 DEQ cites to *Washington v. EPA*, 573 F.2d 583 (9th Cir. 1978), to support its argument that imposition of pre-discharge treatment standards in MPDES permits remains discretionary despite the regulation's mandatory language. The court in *Washington* refused to impose effluent limitations through pre-discharge treatment standards until EPA first had established industry-wide guidelines under § 304(b). *Wash.*, 573 F.2d at 591.

¶35 The Ninth Circuit decided *Washington* before EPA had promulgated 40 C.F.R. § 125.3 in 1979. EPA addressed *Washington* specifically when it promulgated 40 C.F.R. § 125.3. EPA determined that 40 C.F.R. § 125.3 provided what the court in *Washington* had found lacking—the authority and requirements for permit writers to impose pre-discharge

14

treatment standards on a case-by-case basis. 44 Fed. Reg. 32854, 32893 (June 7, 1979). EPA concluded that its new regulation required either the Administrator or the states to enforce pre-discharge treatment standards. 44 Fed. Reg. at 32893.

¶36 The District Court determined that state agencies implementing their own permitting programs, such as DEQ, do not "stand in the shoes" of the Administrator. EPA's regulation defines the "permit writer," however, as either the Administrator or a state. 40 C.F.R. § 125.3(c). DEQ administers MPDES permits for the CBM industry in Montana on a case-by-case basis.

¶37 Contrary to DEQ's claim that it does not "stand in the shoes" of the Administrator, DEQ—as a "permit writer"—must adhere to the same requirement as the Administrator of implementing pre-discharge treatment standards as the minimum level of control required in all permits. *NRDC v. EPA*, 859 F.2d 156 (D.C. Cir. 1988). The *NRDC* court determined that states issuing permits under § 402 "stand in the shoes of the agency" and thus must adhere to the federal requirement to use pre-discharge treatment standards. *NRDC*, 859 F.2d at 183, 187. Further, the court deemed the Ninth Circuit's analysis in *Washington* unconvincing in light of the fact that the court had decided *Washington* before EPA had promulgated regulations. *NRDC*, 859 F.2d at 187.

¶38 The industry defendants in *NRDC* had challenged the Administrator's authority to veto a state-administered NPDES permit. *NRDC*, 859 F.2d at 182. Specifically, the defendants argued that nothing required the states to "adhere to vague technology-based standards set forth in the statute" until EPA had promulgated industry-wide guidelines.

15

*NRDC*, 859 F.2d at 183. The court rejected outright this idea. The court determined that "states are required to compel adherence to the Act's technology-based standards regardless of whether EPA has specified their content" through industry-wide regulations. *NRDC*, 859 F.2d at 183.

¶39    The court concluded that § 402 requires EPA to exercise its best professional judgment in setting effluent limitations in considering permits in the absence of formally promulgated industry-wide guidelines. *NRDC*, 859 F.2d at 183. EPA's best professional judgment requires it to use pre-discharge treatment standards to set effluent limitations, as mandated under § 301(b). The court also concluded that EPA's implementing regulations obligated states to impose pre-discharge treatment standards when standing in the shoes of the Administrator. *NRDC*, 859 F.2d at 183.

¶40    DEQ still maintains, however, that EPA's regulations allow it to enforce effluent limitations in MPDES permits by imposing water quality standards instead of pre-discharge treatment standards as long as the water quality standards are "more stringent." 40 C.F.R §§ 122.44(d), 125.3(a). Section 303 requires states to institute water quality standards that remain subject to federal approval. 33 U.S.C. § 1313. Pre-discharge treatment standards and state-administered water quality standards represent separate and distinct functions of the CWA. *EPA*, 426 U.S. at 204, 96 S. Ct. at 2024.

¶41    State water quality standards "supplement" the protections offered by pre-discharge treatment standards. *EPA*, 426 U.S. at 205, 96 S. Ct. at 2025, FN12. Neither the Administrator, nor states, may supplant pre-discharge treatment standards with water quality

16

standards. *PUD No. 1*, 511 U.S. at 704, 114 S. Ct. at 1905. State water quality standards provide an additional layer of protection when pre-discharge treatment standards alone would not protect water quality. *PUD No. 1*, 511 U.S. at 704, 114 S. Ct. at 1905.

¶42 DEQ argues that it complied with the "more stringent" criteria when it imposed the water quality standards on Fidelity's permits rather than pre-discharge treatment standards. We struggle to conceive how water quality standards could be more stringent than pre-discharge treatment in light of the capability of pre-discharge treatment to clean CBM wastewater. DEQ issued Fidelity's permits based upon a finding that high salinity levels already had impaired the Tongue River. DEQ still chose to administer Fidelity's permits by imposing water quality standards that allowed Fidelity to discharge into the Tongue River nearly seven million pounds of sodium and seventeen million pounds of salts each year under one permit alone.

¶43 The parties do not dispute that Fidelity had a pre-discharge treatment facility already in place that could reduce the CBM wastewater's SAR level to 0.1 or less. DEQ's claim that water quality standards would be more stringent than pre-discharge treatment rings hollow given these facts. We also cannot ignore the fact that EPA's regulations mandate that the Administrator or a state "must" impose pre-discharge treatment standards at a minimum. 40 C.F.R §125.3(a).

¶44 Moreover, DEQ—under the implementing authority of Montana's WQA—has "incorporated by reference" the CWA provisions and EPA's regulations that require use of pre-discharge treatment standards in all MPDES permits. Admin. R. M. 17.30.1303. DEQ's

17

own regulations expressly adopt 40 C.F.R. § 125.3, "setting forth technology-based treatment requirements." Admin. R. M. 17.30.1340(10). EPA's implementing regulations impose a nondiscretionary duty on states to implement pre-discharge treatment standards. Montana's WQA, in turn, imposes a corresponding duty on DEQ to implement pre-discharge treatment standards.

¶45 Finally, DEQ argues that § 75-5-305(1), MCA, prohibits imposition of technology-based limits on an individual discharge when the discharge is considered "nonsignificant." DEQ contends that only BER can adopt technology-based limitations. Appellants correctly point out, however, that § 75-5-305(1), MCA, confines BER's authority to promulgating "industry-wide" technology-based controls in the absence of EPA-promulgated industry-wide guidelines. Nothing in this provision prohibits DEQ from establishing pre-discharge treatment standards on a case-by-case basis. Section 75-5-305, MCA. DEQ's own regulations require it. Admin. R. M. 17.30.1303 and 17.30.1340(10).

## CONCLUSION

¶46 To summarize, the 1972 amendments to the CWA refocused its purpose to eliminating pollutant discharge through the use of pre-discharge treatment standards in the NPDES program. The CWA imposes a duty to apply pre-discharge treatment standards when granting an NPDES permit. CWA §§ 402 and 301. EPA's regulations promulgated under § 301(b) require states to use pre-discharge treatment standards. 40 C.F.R. §§ 122.44, 123.25, and 125.3. Montana has adopted these EPA regulations. Admin. R. M. 17.30.1303. Courts routinely have interpreted the CWA's pre-discharge treatment standards to apply to

18

states since EPA's adoption of regulations in 1979. We, too, determine that the CWA's pre-discharge treatment standards apply to states. DEQ violated the CWA and Montana's WQA by issuing discharge permits to Fidelity without imposing pre-discharge treatment standards.

¶47 We reverse the District Court's decision granting summary judgment to DEQ and declare Fidelity's permits void. We remand to DEQ and direct the agency to re-evaluate Fidelity's permit applications under the appropriate pre-discharge treatment standards within 90 days of this Court's decision, during which time Fidelity may continue operating under its current permits. We need not address other issues raised by Appellants in light of our determination regarding the use of pre-discharge treatment standards in MPDES permits.

/S/ BRIAN MORRIS

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON
/S/ MICHAEL E WHEAT
/S/ PATRICIA O. COTTER
/S/ JIM RICE
/S/ ROBERT L. DESCHAMPS, III
The Hon. Robert L. Deschamps, III, District Court
Judge, sitting for Chief Justice Mike McGrath